**Susanne CORDES, Individually and as Administratrix of the Estate of Edward D. Cordes, Sr., Appellant**

v.

**ASSOCIATES OF INTERNAL MEDICINE; Tri–State Medical Group, P.C.; Tri State Medical Group, P.C. d/b/a/ Associates of Internal Medicine; Ann Marie Ray, M.D.; and Martha Louise Newman, P.A., Appellees.**

Superior Court of Pennsylvania.

Argued April 30, 2013.
Filed March 12, 2014.

Michael A. Murphy, Pittsburgh, for appellants.

Paula A. Koczan and Shari Pakravan, Pittsburgh, for appellees.

BEFORE: STEVENS, P.J.,* BENDER, J., BOWES, J., GANTMAN, J., DONOHUE, J., ALLEN, J., OLSON, J., OTT, J., and WECHT, J.

OPINION IN SUPPORT OF REVERSAL BY WECHT, J.:

In this medical malpractice case, Susanne Cordes ("Appellant"), individually and as administratrix of the estate of Edward D. Cordes, Sr., appeals the October 20, 2011 judgment entered in favor of the above-captioned defendant-Appellees. Appellant claims that the trial court abused its discretion during the jury selection process by denying the challenges for cause she asserted against three venirepersons. Those individuals were empaneled as jurors, and the jury returned a defense verdict.

___

* Former President Judge Stevens did not participate in the consideration or decision of

We vacate the judgment, and we remand.

## I. Factual and Procedural History

On June 8, 2007, Appellee Ann Marie Ray, M.D., Mr. Cordes' primary care physician, diagnosed him with vertigo. Dr. Ray concluded that Mr. Cordes had not suffered a transient ischemic attack. Dr. Ray directed Mr. Cordes to discontinue his use of Plavix, a blood thinner. On August 17, 2007, Mr. Cordes suffered a massive stroke. He died on August 19, 2007. On May 1, 2009, Appellant filed a malpractice complaint. Appellant alleged that Dr. Ray's misdiagnosis and discontinuation of Mr. Cordes' use of Plavix constituted a departure from the applicable standard of care.

Jury selection occurred on May 6, 2011. The venirepersons were asked four preliminary questions as a group, including inquiries seeking to determine whether any prospective jurors had any acquaintance with the parties and other specified individuals. *See* Notes of Testimony ("N.T."), 5/6/2011, at 16, 18. After these preliminary questions, counsel adjourned to the deliberation room, where they summoned prospective jurors for individual *voir dire*. *See id.* at 19. The court indicated that, after each venireperson was questioned by counsel, the parties would make any challenges for cause and exercise any desired peremptory challenges. *Id.* at 9–10, 13.

Appellant exercised all four of her peremptory challenges before then-prospective jurors Richard Majors, Christine Kaelin, and Sean Snowden, respectively, were called for individual questioning. *See id.* at 107. Appellant exhausted her challenges despite her prior knowledge, from

this case.

the preliminary *voir dire* in open court, that Mr. Majors knew or had "social, business, or other contact or employment with any of the parties," *id.* at 16, and that one of Ms. Kaelin's family members had had "social, business, or professional contact" with one or more of five individuals named as potential witnesses, one of whom was Dr. Ray. *Id.* at 18.

The trial court described the individual *voir dire* proceedings as follows:

During individual voir dire, [Mr. Majors] revealed that he was an employee of Heritage Valley Health Systems ["Heritage Valley"]; however, ... he did not know Dr. Ray personally. Notes of Testimony ("N.T."), 5/6/2011, at 107. Mr. Majors indicated that he manages the leases for which Heritage Valley acts as a landlord and was aware that Dr. Ray's practice group leased office space from Tri–State Medical Group ["Tri–State"], which is an entity of [Heritage Valley]. *See id.* at 107–11. Mr. Majors' employment with Heritage Valley did not involve any medical care and/or treatment of patients. *See id.* at 110. Further, he stated that he would not consider whether a potential verdict in favor of [Appellant] would somehow adversely affect Heritage Valley's financial status. *See id.* at 111–12. Mr. Majors stated that his employment with Heritage Valley would not prevent him from being a fair and impartial juror. *See id.* at 107–19. [Appellant's] counsel moved to strike Mr. Majors for cause due to his employment with Heritage Valley. [Appellant] claim[ed] that Mr. Majors' close financial relationship with co-employee Dr. Ray compelled exclusion.

Notably, [Heritage Valley] was not a named defendant in this case. Moreover, [Heritage Valley] is a large health system corporation and one of the chief employers in Beaver County. Practical-

ly, the court appropriately denied the motion stating that Mr. Majors, on multiple occasions, said that he could render a verdict against Dr. Ray, irrespective of his employment with Heritage Valley. *See id.* at 117–19.

\* \* \*

[Also] during individual voir dire, [Ms. Kaelin] revealed that Dr. Ray is her parents' physician. However, she indicated that she could be fair and impartial in a case involving Dr. Ray. *See id.* at 177–78. Upon further examination by [Appellant's] counsel, Ms. Kaelin stated that while she had taken her mother to a doctor's appointment, she had never met Dr. Ray and would not be more inclined to believe Dr. Ray because her parents have a good impression of [her]. *See id.* at 180–81. In fact, Ms. Kaelin indicated that she could disbelieve Dr. Ray and render a verdict against her if the evidence warranted such a result. *See id.* at 181. [Appellant's] counsel moved to strike [Ms. Kaelin] for cause due to her parents' relationship with Dr. Ray.

[Appellant] argue[d] that Ms. Kaelin had a close situational relationship with Dr. Ray. However, [Ms.] Kaelin clearly indicated that she had never met Dr. Ray. While her parents may have a close situational relationship with Dr. Ray, there was nothing to suggest to this Court that Ms. Kaelin, herself, had any type of relationship with Dr. Ray. Accordingly, the Court properly denied [Appellant's] motion to strike Ms. Kaelin for cause as Ms. Kaelin clearly demonstrated that she could render a fair and impartial verdict notwithstanding her parent's relationship with Dr. Ray. *Id.* at 186–87.

A jury panel was selected and [Mr. Snowden] was selected and sworn in as [a] juror. After the jury panel was selected and trial had commenced, counsel

for Dr. Ray[ ] advised the Court that after [she] reviewed [her] patient list she recognized the name Snowden as one of her patients. The Court, with counsel present, brought Mr. Snowden into chambers. Mr. Snowden explained that the night before he and his wife were having a conversation in which she expressed her intent to get Chantix in an attempt to cease smoking. Mr. Snowden then asked her who[m] she would get the Chantix from and she said Dr. Ray. According to Juror Snowden, this was the first time he learned that his wife treated with Dr. Ray. In addition, he indicated that he had never personally met Dr. Ray and that he was able to decide the case fairly and without bias or prejudice. *See* N.T. In–Chambers Proceeding, 5/11/2011, at 2–6.

Again, [Appellant] claim[ed] that Juror Snowden had a close situational relationship with Dr. Ray. However, as the Court indicated on the record, Mr. Snowden was not, himself, a patient of Dr. Ray, never had any contact with Dr. Ray and had just learned that Dr. Ray was his wife's doctor. *Id.* at 8. Mr. Snowden had no personal relationship with Dr. Ray at all. In response to [Appellant's] counsel's extensive questioning, Mr. Snowden clearly stated that he would not feel uncomfortable entering a verdict against Dr. Ray, given the fact that she was his wife's doctor. *Id.* at 5. Mr. Snowden did not demonstrate any close or real relationship with Dr. Ray that would warrant his dismissal. Accordingly, the Court properly refused to dismiss this juror.

Trial Court Opinion ("T.C.O."), 9/20/2011, at 6–9 (citations modified; emphasis omitted).

On May 13, 2011, the jury returned a verdict in favor of Appellees. Appellant filed timely post-trial motions, which the trial court denied on September 20, 2011. Judgment was entered on October 20, 2011, and this timely appeal followed.[1]

Appellant raises two questions for our review:

1. Whether the trial court erred by failing to presume prejudice and strike two jurors who had close situational relationships with a litigant in that their immediate family members were current patients of the Defendant, Dr. Ray?
2. Whether the trial court erred by failing to presume prejudice and strike a juror who had a close financial relationship with a litigant in that he was employed by the same corporation as the Defendant, Dr. Ray?

Brief for Appellant at 4 (issues reordered).

## II. Legal Standard

■■■ Our standard of review of a court's decision not to strike a potential juror for cause is well-settled:

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses

1. It appears that the trial court did not order Appellant to file a concise statement of errors complained on appeal pursuant to Pa.R.A.P. 1925(b). Nor did the trial court file a Rule 1925(a) opinion. However, the trial court's

September 20, 2011 Opinion and Order provides us with that court's reasoning. Thus, we have what we need to review the merits of Appellant's issues.

that the court will presume a likelihood of prejudice[,] or demonstrates a likelihood of prejudice by his or her conduct and answers to questions. Our standard of review of a denial of a challenge for cause differs, depending upon which of these two situations is presented. In the first situation, in which a juror has a close relationship with a participant in the case, the determination is practically one of law and as such is subject to ordinary review. In the second situation, when a juror demonstrates a likelihood of prejudice by conduct or answers to questions, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in the case of palpable error. When presented with a situation in which a juror has a close relationship with participants in the litigation, we presume prejudice for the purpose of [en]suring fairness.

*McHugh v. P & G Paper Prods. Co.,* 776 A.2d 266, 270 (Pa.Super.2001) (footnote, citations, internal quotation marks, and original modifications omitted).

■ This Court previously has described this inquiry in general terms as follows:

[T]here are two types of situations in which challenges for cause should be granted: (1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at voir

dire. In the former situation, the determination is practically one of law and as such is subject to ordinary review. In the latter situation, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in case of palpable error.

*Commonwealth v. Colon,* 223 Pa.Super. 202, 299 A.2d 326, 327–28 (1972). Importantly, this Court has held as follows:

The two situations ... are not mutually exclusive, and it is to be expected that some cases will present both situations. Thus a prospective juror may indicate by his answers on voir dire that he will not be impartial—the [second] situation—and the reasons for his attitude may be that he has a particular relationship with someone involved in the case— the [first] situation.

*Commonwealth v. Johnson,* 299 Pa.Super. 172, 445 A.2d 509, 512 (1982).[2] Inasmuch as the first category of challenge presents a question of law, we review the trial court's ruling *de novo,* and the scope of our review is plenary. *Stamerro v. Stamerro,* 889 A.2d 1251, 1257 (Pa.Super.2005).

Our Supreme Court recently has reminded us that "[o]ne of the most essential elements of a successful jury trial is an impartial jury." *Bruckshaw v. Frankford Hosp.,* 619 Pa. 135, 58 A.3d 102, 109 (2012) (citing *Colosimo v. Penna. Elec. Co.,* 513 Pa. 155, 518 A.2d 1206, 1209 (1986)). To that end, "[t]hrough the voir dire process individuals with bias **or a close relationship to the parties, lawyers or matters involved** are examined and excluded." *Id.*

2. The learned dissent goes to great lengths to distinguish *Johnson* from the case at bar in ways that we do not dispute. Diss. Op. at 849–53. We cite *Johnson* merely to emphasize that, even in the context of the *per se* prejudice test, the trial court has more than an automaton's role to play in assessing the

relationships and in ruling on whether those relationships are so close or real as to require exclusion *per se.* It is hardly uncommon for this Court to quote a case that informs a given area of law in elucidating general principles, even though that case is distinguishable in its particulars.

at 110 (emphasis added). Thus, for more than a century, our Supreme Court has held that it is incumbent upon a court faced with a for-cause challenge to consider not just the **fact** of partiality, but also **the prospect or appearance** of partiality or bias. *See Commonwealth v. Stewart,* 449 Pa. 50, 295 A.2d 303, 306 (1972) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)) ("[O]ur system of law has always endeavored to prevent **even the probability of unfairness.**" (emphasis added)); *Seeherman v. Wilkes–Barre Co.,* 255 Pa. 11, 99 A. 174, 176 (1916) ("It [is] certainly desirable that the cause should be tried by persons free even from the suspicion of partiality."); *Hufnagle v. Delaware & H. Co.,* 227 Pa. 476, 76 A. 205, 206 (1910) ("[N]o person should be permitted to serve on a jury who stands in any relation to a party to the cause that would carry with it *prima facie* evident marks of suspicion of favor....") (internal quotation marks omitted)); *Schwarzbach v. Dunn,* 252 Pa.Super. 454, 381 A.2d 1295, 1297–98 (1977) (directing a mistrial in order to "tip the balance in favor of [e]nsuring a fair trial" because "the potential for prejudice was great," even though the critical premise was "never factually established"); *see also Commonwealth v. Stitzel,* 309 Pa.Super. 43, 454 A.2d 1072, 1075 n. 8 (1982) (citing *Schwarzbach* to reinforce the importance of erring on the side of fairness even when faced with "only the potential for prejudice"). The importance of addressing the prospect, as well as the fact, of bias is necessarily embodied in the two-pronged *Colon* test. That a category of exclusion is to be effectuated *per se* would make little sense if it were not animated by courts' historic concern for the **prospect** of jury

bias, since application of that test forecloses any inquiry into **actual** bias.

Thus, at issue in this appeal, given the undisputed absence of admissions of partiality, is the prospect or appearance of partiality or bias with respect to three jurors: two whose close family members were patients of the defendant-Appellee physician, Dr. Ray, at the time of jury selection; and one whose employer, Heritage Valley, owned Tri–State, a named defendant in this action and defendant-Appellee Dr. Ray's employer. During *voir dire,* the latter juror attested to his belief that Heritage Valley had a financial interest in the outcome of the litigation through its subsidiary, Tri–State, and further testified that he and Dr. Ray shared a common employer.

As to the three jurors whom Appellant maintains should have been excluded for cause, Appellant focuses exclusively upon the first test articulated in *McHugh* and *Colon,* which addresses potential conflicts arising from a close familial, financial, or situational relationship with the parties. Appellant does not contend that the jurors' testimony during *voir dire* constituted a viable basis for relief. This is a natural consequence of the fact that, during *voir dire,* each challenged juror attested under oath to his or her ability to be impartial.[3] Were the fitness of the jurors in question dependent solely upon their indications under oath regarding their ability to be impartial, our deference to the trial court's findings with regard to these answers would compel affirmance. *See McHugh,* 776 A.2d at 270. However, despite the trial court's focus on the jurors' own testimony, the challenge presented here turns instead upon the situational relationships of the challenged jurors to the parties and interested non-parties.

---

**3.** *See* N.T., 5/6/2011, at 107–17 (Richard Majors); *id.* at 177–86 (Christine Kaelin); N.T. In-Chambers Proceeding, 5/11/2011, at 2–4 (Sean Snowden).

In *McHugh,* an insured worker brought a premises liability claim against Proctor & Gamble Paper Products Company ("Proctor & Gamble"). At trial, Proctor & Gamble was represented in person by its employee, Patrick Fellin. Although Mr. Fellin was not a party to the litigation, he was to be seated at counsel's table during trial. Proctor & Gamble characterized Fellin as nothing more than "window dressing," and asserted that "Fellin would not testify, . . . had no involvement in the incident with McHugh, and . . . he simply would sit at counsel table . . . to represent Proctor & Gamble." *Id.* at 272.

During *voir dire,* five members of the initial twenty-four member jury pool indicated that they were acquainted with Mr. Fellin. One individual indicated that he worked at the same Proctor & Gamble plant and in the same department as Mr. Fellin. Two more prospective jurors knew Mr. Fellin as a fellow employee at the same plant. A fourth prospective juror formerly had worked in the same department as Mr. Fellin, but had since retired. Finally, a fifth venireman indicated that Mr. Fellin was his son-in-law. 776 A.2d at 268.

McHugh's counsel asked the court to strike the first four of these prospective jurors based upon their employment relationships with Proctor & Gamble and Mr. Fellin, and the fifth prospective juror due to his familial relationship with Mr. Fellin. In open court, the trial court inquired of each challenged venireman whether he could "render a fair and impartial verdict based only on the evidence." When each prospective juror answered affirmatively, the trial court denied McHugh's motion to strike as to all five.

Thereafter, McHugh's counsel questioned each of the five veniremen individually. Mr. Fellin's father-in-law replied to counsel's inquiry regarding whether he would be "personally affected or [his] son-in-law [would] be affected by [him] . . . sitting on this jury and rendering" a verdict against Proctor & Gamble, as follows: "I don't know if I'd be[;] he would." *Id.*

McHugh filed a pre-trial motion for a mistrial on the basis that the trial court erred in denying his for-cause challenges to Mr. Fellin's father-in-law and the Proctor & Gamble employees. The trial court denied McHugh's motion, the case went to trial, and the jury "rather quickly" rendered a verdict against McHugh. *Id.*

With regard to those who had employment relationships with Proctor & Gamble, this Court held on appeal that "the employer/employee relationship evokes a presumption of prejudice so significant as to warrant disqualification of employees of a party." *Id.* at 270. We explained: "Over ninety years ago, our Supreme Court recognized that, where a litigant is in a position where he might exercise control over a juror, such as the relation of master and servant, that juror should not be permitted to serve on the jury." *Id.* (citing *Hufnagle, supra*). We further observed that "[d]ecisions to automatically exclude a prospective juror from a jury are based upon 'real' or 'close' relationships between the juror and the case due to financial, situational or familial ties with the parties, counsel, victims or witnesses." *Id.* at 271 (citing *Commonwealth v. Rough,* 275 Pa.Super. 50, 418 A.2d 605, 609 (1980)). After reviewing the largely consistent law of other states, we held that the employer-employee relationship comprised such a relationship due to "the presumption of loyalty of employees to their employer" and the manifest potential "that jurors who are employees of a party are unlikely to hear the case with a clean slate and an open mind." *Id.* (quoting *Kusek v. Burlington N. R.R. Co.,* 4 Neb.App. 924, 552 N.W.2d 778, 782 (1996)).

In light of these principles, we determined that the Proctor & Gamble employees should have been stricken for cause:

> Clearly, Proctor & Gamble maintains an overwhelming presence in the lives of its employees residing in that area, to the extent that the livelihoods of the employee and his or her family become wholly intertwined with Proctor & Gamble. We cannot reasonably expect a person whose livelihood derives from a party to render an impartial verdict in a case involving that party, regardless of that person's belief that he or she can do so.

*Id.* at 272. Yet, in the case now before us, the trial court cited precisely the same consideration as a basis **not** to excuse Mr. Majors from the jury. T.C.O. at 7 ("[Heritage Valley] is a large health system corporation and one of the chief employers in Beaver County. Practically, the court cannot dismiss for cause every employee of Heritage Valley.").

In *Schwarzbach*, we reversed a trial court's refusal to excuse a juror who had an indirect relationship to case counsel. Specifically, the wife of the juror in question had some history of employment with the law firm representing the plaintiff. The plaintiff's counsel opposed exclusion, contending that the juror's wife had worked in counsel's office only on a part-time basis, and had worked only for a member of the firm unconnected to the case at bar. 381 A.2d at 1297. Moreover, plaintiff's counsel observed that, in rural Elk County, stenographers serve multiple law firms. *Id.* Although "it was never

factually established just what the secretary's relationship was with the law office of [plaintiff's] attorney," we emphasized that "the potential for prejudice was great in that it is quite possible that a secretary in a law office could influence her husband in deciding a matter in which her employer is counsel." *Id.* at 1298.

We found that the potential for prejudice noted above was sufficient to declare a mistrial and to remand. Of critical importance to today's case, we couched our ruling not in the certainty or proximity of the problematic relationship but in the **uncertainty** surrounding the indirect relationship between the juror and counsel:

> The problem here is that it was never factually established just what the secretary's relationship was with the law office of [the plaintiff's] attorney. It is implied by one of the parties that she was an occasional employee of many law offices in the area. However, this was never determined as factual. In fact, her relationship with the law offices was never made clear anywhere. If she was a mere occasional employee or if a great deal of time had passed since she was so employed the potentialities of prejudice of her husband sitting on the jury would not be great enough to warrant a new trial. However, we do not have the answers to these questions and ... we are inclined to tip the balance in favor of [e]nsuring a fair trial here.

*Id.*[4]

From the particularities of these decisions several general principles emerge:

**4.** This rebuts the dissent's claim that "all of our cases have required record evidence of a tangible connection between a prospective juror and case participant before *per se* prejudice is found" Diss. Op. at 854 n. 6 (emphasis in original). In *Schwarzbach*, it was precisely the absence of such evidence, and our historical inclination toward caution, that prompted

us to reverse the trial court's empanelment of the challenged juror. While the dissent is correct that, in *Schwarzbach*, "the record was devoid of any facts from which the court could determine what the relationship was between the juror's wife and plaintiff's attorney," *id.*, this observation stands beside the dissent's own central point. Were the dis-

First, indirect relationships of a juror to a party with which the juror has had no direct contact, including connections through spouses with a potential (also indirect) employment-related interest in the outcome of the trial, **may** furnish a basis for *per se* exclusion; second, that trial courts must err on the side of caution when confronted with such an indirect relationship; and third, that no matter the *per se* nature of the applicable test, the trial court retains discretion to identify and assess the quality of the specific relationship at hand, as evinced by our acknowledgment in *Schwarzbach* that variations on the relationship in question, including the frequency or remoteness in time of the employment relationship between the juror's wife and counsel, might dictate contrary results.[5]

---

sent's account of *Colon* the final word, there could be **no** relationship of **any** character between a juror's **wife** and case counsel that would require *per se* exclusion. Rather, absent a **direct** relationship between the juror and counsel, the exclusion determination necessarily would be vested in the trial court discretion, not determined on a *per se* basis.

Notwithstanding the deficiencies of the record in *Schwarzbach*, however, there was no suggestion by any court or party that the juror in question might, himself, have had a direct relationship to any case participant. Thus, the dissent's attempt to focus upon this Court's discussion regarding the absence of an opportunity for the objecting party to make a record, given the late disclosure of the relationship in question, is irrelevant. The dissent offers no reason to overlook *Schwarzbach's* recognition that an undisputedly "indirect" relationship not only **might** require *per se* disqualification, but indeed as a matter of jurisprudential caution **did** require *per se* disqualification when the record presented the possibility that further examination might have revealed a sufficiently close, albeit necessarily indirect, situational relationship to require *per se* exclusion. Nor has the dissent any response to the necessary implication that the test for such relationships involves more than inputting the relationship category and retrieving an inexorable output, but rather requires case-specific assessments of the challenged relationship, whether direct or indirect.

5. This case law contradicts the learned dissent's rigid reading of the *Colon* test to require per se exclusion only when confronted with a relevant "direct" relationship. *See, e.g.,* Diss. Op. at 854 ("The plain text of the rule that emerged from *Colon* **demands** that a disqualifying relationship be a **direct** and **immediate** connection that exists between the prospective juror and a party, case counsel, a victim, or a witness." (emphasis added)). Rather than employ the "direct" terminology favored by the dissent, our case law has characterized problematic situational relationships as "close" or "real," *see, e.g., Colon,* 299 A.2d at 327 ("close"); *Commonwealth v. Sheaff,* 365 Pa.Super. 613, 530 A.2d 480, 483 (1987) ("real"); *Rough,* 418 A.2d at 609 (Pa.Super.1980) (" 'real' or 'close' "), words that are not mutually exclusive of "indirect" or "mediated." Most importantly, in *McHugh* and *Schwarzbach,* which both postdate *Colon,* we found per se prejudice in familial relationships between a juror and individuals who were not parties, counsel, victims, or witnesses. Reading *Colon* narrowly, without acknowledging the complications introduced by later cases, would create more confusion than it cures by calling into question the validity of those later cases. Moreover, if *Colon sub silentio* proposed that only "direct" relationships warrant per se exclusion, it must yield to our more recent decisions in *McHugh* and *Schwarzbach. Cf. Hack v. Hack,* 495 Pa. 300, 433 A.2d 859, 868 (1981) ("There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances. . . ." (internal quotation marks omitted)).

Nonetheless, the dissent suggests that it has identified a line of authority that unequivocally precludes *per se* exclusion based upon indirect relationships. *See* Diss. Op. at 853–56. While these cases may have involved indirect relationships deemed insufficient to require *per se* exclusion, none involved close familial relationships akin to those between Ms. Kaelin and Mr. Snowden and their immediate relatives who were treating with defendant-Appellee Dr. Ray. Nor do any of the dissent's cases address a business interest conflict akin to that presented by Mr. Majors. *See Colon,*

Our analyses in *McHugh* and *Schwarzbach* are not entirely dispositive of our determination as to whether the trial court should have stricken the jurors at issue in the circumstances presented in the instant case. However, the exclusion of Mr. Fellin's father-in-law in *McHugh* provides an instructive analogy to the instant case. That prospective juror did not have a direct relationship to the parties, counsel, victims, or witnesses in that case, because his only connection to a party was mediated through Mr. Fellin, who fit none of these descriptions.[6] As well, in *Schwarzbach*, a relationship between a juror and counsel mediated through a spouse was held to require exclusion *per se*, despite the insufficiency of the record to confirm the details of that relationship. Thus, to reconcile *McHugh*, *Schwarzbach*, and *Colon*, as we must to the extent possible, we are bound to conclude that a close situational relationship with a party may be found even when the relationship in question is indirect. We must determine whether the trial court—in assessing the relationships in the fashion recommended by *Schwarzbach* and noted without criticism in *Johnson*—erred in determining that the particular relationships were not so close or real as to require exclusion.

We find additional guidance in other cases decided by Pennsylvania courts, as well as decisions by courts of other jurisdictions. For example, our Supreme

223 Pa.Super. 202, 299 A.2d 326 (denying *per se* exclusion where juror was police commissioner for local township with "no particular relationship to the case or to the police force involved"); *Commonwealth v. Blasioli*, 454 Pa.Super. 207, 685 A.2d 151 (1996) (juror was colleague and patient of prosecutor's wife, but had not interacted with prosecutor); *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999) (father of defendant was juror's "husband's sister's son," a man whom she had little contact with and sometimes confused with other relations); *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 332–34 (2011) (juror A affiliated with same athletic organization as wife of a victim, but never interacted with wife; juror B's husband practiced archery with victim twelve years earlier, but had no contact with victim after marrying juror B; juror C was Bradford County corrections officer but had no contact with victims, Bradford County sheriff's deputies); *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 299 (1996) (juror's brother was police officer in jurisdiction of the crime but uninvolved in the case); *Linsenmeyer v. Straits*, 402 Pa. 7, 166 A.2d 18, 23 & n. 2 (1960) (jurors had prior relationships with counsel that were not recent).

The mere fact that **some** indirect relationships have been found by Pennsylvania courts not to require exclusion does not necessitate the conclusion that **no** indirect relationship may require exclusion. *McHugh* and *Schwarzbach* underscore that point.

**6.** The dissent rejects this characterization, maintaining that "Fellin, in his capacity as a designated representative of the corporation at trial, clearly qualified as a case participant because of his status as a party's authorized agent." Diss. Op. at 862 n. 14. First, it is unclear what, if anything, Fellin was "authorized" to do at trial, given Proctor & Gamble's characterization of Fellin as "window dressing" who "simply would sit at counsel table." *McHugh*, 776 A.2d at 272. Second, even if Fellin were a "director," "officer," or "agent" of Proctor & Gamble, as the dissent appears to infer with its citation of *Utica Mutual Insurance Co. v. Contrisciane*, 504 Pa. 328, 473 A.2d 1005, 1013 (1984), this would not make Fellin a party in his individual capacity. It is not at all clear whether the dissent's rigid reading of *Colon* would allow *per se* exclusion of a juror with a direct but personal connection to an individual acting not on his own behalf but on behalf of a corporate party, given that it is not clear why, on such a reading, it might not be sound to infer a juror's bias in favor of a corporation based upon a juror's feelings about an individual who is appointed to act on behalf of that corporation. Under such circumstances, arguably the juror's connection to the party itself would be "indirect," and therefore not require *per se* exclusion on the dissent's account of the standard.

Court and other courts have held that a stockholder in a corporation that has an interest in the matter may not be empaneled. *See Seeherman,* 99 A. at 175; *see also Salt River Valley Water Users' Ass'n v. Berry,* 31 Ariz. 39, 250 P. 356, 357 (1926); *McLaughlin v. Louisville Elec. Light Co.,* 100 Ky. 173, 37 S.W. 851, 855 (1896); *Ozark Border Elec. Coop. v. Stacy,* 348 S.W.2d 586, 589 (Mo.Ct.App.1961) (collecting cases and noting that "[t]he general rule that a stockholder in a corporation is incompetent to sit as a juror in an action to which the corporation is a party or in which it has a direct pecuniary interest is stated without qualification or exception"). Similarly, courts have found a dispositive risk of partiality in a prospective juror who is a shareholder in an insurance company bound to indemnify the defendant for any judgment entered against him. *Citizens' Light, Heat & Power Co. v. Lee,* 182 Ala. 561, 62 So. 199, 205 (1913); *Thompson v. Sawnee Elec. Membership Corp.,* 157 Ga. App. 561, 278 S.E.2d 143, 144 (1981). And, in *Wallace v. Alabama Power Co.,* 497 So.2d 450, 453–54 (Ala.1986), a shareholder in a corporation with an ownership stake in a party to the litigation was deemed excludable as a matter of course.[7]

When such potential conflicts arise, the trial court may not rely upon a juror's assurances that he can set aside his own interests and deliberate without bias. On appeal, our traditional deference to the trial court's credibility determinations becomes immaterial to determining whether a given juror should have been disqualified. Thus, in *M & A Electric Power Cooperative v. Georger,* the Missouri Supreme Court explained:

> [T]he fact that the members, when interrogated, denied that they would be prejudiced by reason of such interest is not conclusive. . . . [Venirepersons] are not to . . . determine their own qualifications, and we remain mindful of the eternal verity that, whatever else may change in this changing world, the impelling self-interest, motivating emotions and besetting frailties of members of the human family abide unchanged.

480 S.W.2d 868, 874 (Mo.1972) (internal citations and quotation marks omitted). Our own Supreme Court's ruling in *Seeherman* is in accord. *See* 99 A. at 176.

In sum, while the weight of authority makes clear that we must defer to the trial court's discretion in assessing whether a prospective juror's assertions of impartiality are credible, this deference applies only when the issue hinges upon a question of partiality arising from the would-be juror's comments in *voir dire.* Conversely, when faced with a sufficiently close situational relationship between the venireperson and a party to the litigation, or to an entity with an interest in the outcome of the litigation, prejudice must be assumed, the venireperson's protestations of impartiality notwithstanding.

With these principles in mind, we turn now to the matter at hand, examining, in

---

**7.** The dissent insists that the financial relationships in all of these cases were "direct." Diss. Op. at 861 n. 13 ("In those cases[, *i.e., Citizens' Light, Heat & Power* and *Wallace* ], the jurors maintained **direct** financial relationships with parties to the respective actions. . . ." (emphasis added)). We are at a loss to discern how the dissent can maintain, for example, that a juror with a financial interest in an insurance company bound to indemnify a party, as in *Citizens' Light,* has the **direct** relationship to a **party** that the dissent insists *Colon* requires. The same analytical problem arises with regard to *Wallace,* in which the prospective juror was not directly connected to a party, but rather was a shareholder in the corporate parent of the party-defendant. These relationships are "direct" only if the word is defined so broadly as to lose all precedential utility.

turn, the relationships of the prospective jurors in question to the litigation.

## III. Analysis

### A. Ms. Kaelin's and Mr. Snowden's Vicarious Relationships with Dr. Ray

During individual *voir dire,* Ms. Kaelin testified as follows:

THE COURT: ... The one thing we noticed is that you responded that you knew someone in this case when the witness list was read.

[Ms. Kaelin]: Well, my parents go to Dr. Ray as their physician.

THE COURT: All right. Does that in any way prevent you from sitting on a case where ... Dr. Ray is the named Defendant?

[Ms. Kaelin]: No.

THE COURT: All right, and you're sure about that?

[Ms. Kaelin]: Yes.

\*   \*   \*

[COUNSEL]: Can you give us an idea of how long [your parents] have been patients with her?

[Ms. Kaelin]: No. I just know that they tell me they go to see Dr. Ray a lot.

[COUNSEL]: Have they ever told you what they think of Dr. Ray as a doctor?

\*   \*   \*

[Ms. Kaelin]: They like her.

\*   \*   \*

[COUNSEL]: Have you ever met Dr. Ray?

[Ms. Kaelin]: No.

[COUNSEL]: Ma'am, Dr. Ray may be called to the witness stand and likely testify in this case.... Would you have a tendency to believe Dr. Ray over someone else given the fact that your parents have a good impression of her?

[Ms. Kaelin]: Not that I would, can think of. No, I don't think I would.

\*   \*   \*

[COUNSEL]: And, ma'am, if the evidence was such that Dr. Ray may have been negligent in this case, are you telling me that you could find Dr. Ray negligent, even if ... your parents are [patients] of hers?

[Ms. Kaelin]: Yes.

N.T., 5/6/2011, at 177–81.

Like Ms. Kaelin, Mr. Snowden's potential conflict came through a close family member who treated with Dr. Ray—in his case, his wife. Mr. Snowden's testimony came not during individual *voir dire,* when he was unaware of his wife's clinical relationship with Dr. Ray, but after trial had commenced and before the jury deliberated. On May 11, 2011, before the day's trial proceedings got underway, Dr. Ray's counsel informed the court that, upon review of her patient list, Dr. Ray recognized the name Snowden. The court summoned Mr. Snowden to chambers, and the following discussion ensued:

THE COURT: [Mr. Snowden], I brought you in, because during the evening, Dr. Ray, in all fairness and ethically, took a look at her list of patients and saw your name.

Does your wife ... treat with her?

[Mr. Snowden]: I just found out yesterday that she does....

THE COURT: You have never met her—

[Mr. Snowden]: No.

THE COURT:—prior to this case, but the question comes down to, the fact that because your wife is a patient of Dr. Ray, would that in any way affect your ability to decide this case?

[Mr. Snowden]: It would not.

N.T. In–Chambers Proceeding, 5/11/2011, at 2–4.

As noted *supra,* the trial court found that these jurors' connections to Dr. Ray did not warrant striking either for cause. The trial court essentially ruled that there was no real or close familial or situational relationship, and relied upon each juror's assurance that he or she impartially could assess Dr. Ray's credibility and liability. *See* T.C.O. at 8 ("[T]here was nothing to suggest to this Court that Ms. Kaelin, herself, had any type of relationship with Dr. Ray."), 9 ("Mr. Snowden did not demonstrate any close or real relationship with Dr. Ray that would warrant his dismissal."). Notably, the trial court was entirely silent regarding the appearance of partiality that might arise from these relationships, a consideration our cases make clear bears on a for-cause inquiry based upon a situational-relationship challenge.

Were Ms. Kaelin and Mr. Snowden patients of Dr. Ray, our decision might be more simple and direct. *See, e.g., Marcin v. Kipfer,* 117 Ill.App.3d 1065, 73 Ill.Dec. 510, 454 N.E.2d 370 (1983) (reversing trial court's refusal to disqualify jurors who were patients of defendant physician). The single degree of remove between those two jurors and Dr. Ray prompts the question of whether that subtle distinction suffices to avoid a finding of *per se* prejudice. Although neither our Supreme Court nor this Court has confronted precisely this question, in *Estate of Hannis v. Ashland State General Hospital,* 123 Pa. Cmwlth. 390, 554 A.2d 574 (1989), our sister Commonwealth Court rejected the argument that a juror was disqualified in a medical malpractice action because that juror's child was a patient of the defendant physician. *Id.* at 578–79. In so ruling, the Commonwealth Court cited its deferential standard of review over the trial court's reliance upon the juror's assertion that she could rule impartially. *Id.* However, the court failed even to acknowledge the per se prejudice that we have recognized arises in the context of certain close relationships, and made no assessment as to whether the relationship there at issue caused such prejudice as a matter of law. Instead, like the trial court in the instant matter, the Commonwealth Court took the juror's testimony regarding her impartiality at face value. We are not bound to follow the decisions of the Commonwealth Court. *Petow v. Warehime,* 996 A.2d 1083, 1089 n. 1 (Pa.Super.2010). While we often find that esteemed court's decisions persuasive, we do not do so in the instant case, given the incomplete analysis of the relevant part of the governing standard. *Cf. Commonwealth v. Tilghman,* 543 Pa. 578, 673 A.2d 898 (1996) (holding that a *per curiam* affirmance by the Supreme Court is not binding authority, because such an order does not relate its rationale).

■■ We hold that the clinical relationships of Ms. Kaelin's and Mr. Snowden's close family members with Dr. Ray were sufficiently close and real to warrant a finding of *per se* prejudice. Thus, we conclude that the trial court failed to pay due regard to the precept that the mere appearance of partiality on the part of a juror may suffice to undermine confidence in the outcome of the trial. *See, e.g., Seeherman; Hufnagle; Schwarzbach, supra.* Moreover, contrary to the trial court's stated concern for such a ruling's effect on the jury pool, *see* T.C.O. at 7, we find no indication that excluding these jurors or others with similar situational relationships to Dr. Ray would in any way have impeded the empaneling of a qualified jury. Nothing suggests that Heritage Valley was so pervasive an employer, or that Dr. Ray was so popular a physician, that a jury free of such ties could not be assembled from the citizenry of Beaver County

so as to ensure the return of an untainted verdict.[8]

The record indicates that Ms. Kaelin's parents and Mr. Snowden's wife both had treated and would continue to treat with Dr. Ray as their primary care physician. This implicit—and in the case of Ms. Kaelin's parents, explicit—endorsement of Dr. Ray's competence by close family members created the prospect or appearance that these jurors' ability to judge Dr. Ray's credibility and liability impartially would be compromised, given the presumptive strength of their immediate family members' established physician-patient relationships. *Cf. Thierfelder v. Wolfert*, 617 Pa. 295, 52 A.3d 1251, 1284–85 (2012) (Todd, J., dissenting) (characterizing the physician-patient relationship as "one of the closest recognized in our law").

Ms. Kaelin's and Mr. Snowden's close familial relationships with patients of Dr. Ray warrant a finding of *per se* prejudice. We do not posit that no one may be qualified to sit in judgment of a physician simply for knowing or being related in some way to a patient thereof. But the bonds between parent and child, and husband and wife, are too strong, and the attendant interests too inextricably intertwined, to allow us to draw the distinction between direct and vicarious clinical relationships that we would require in order to affirm the trial court's decision. It cannot be gainsaid that the spousal and filial relationships are among the closest of human connections. Accordingly, the trial court erred when it declined to disqualify Ms. Kaelin and Mr. Snowden as jurors.[9]

## B. Mr. Majors' Employment–Related Relationship with Appellees

The question of Mr. Majors' qualification hinges on a different, but related, question. As is the case with Ms. Kaelin and Mr. Snowden, Mr. Majors' qualification turned upon a relationship that resembles the close financial or situational relationships that courts have found create the prospect or appearance of partiality. In Mr. Majors' case, the connection at issue was a business relationship with an employer-employee dimension, rather than a familial or doctor-patient relationship.

8. We share wholeheartedly Judge Donohue's sentiment that "[a] trial is either fair or it is not[,] and litigants are entitled to a jury free from bias and prejudice." Judge Donohue's Opinion in Support of Reversal ("D.O.S.R.") at 864 n. 1.

9. Judge Donohue would not exclude all jurors whose parents have a connection to a party-physician, such as Ms. Kaelin, but rather favors a case-by-case inquiry. *See* D.O.S.R. at 867–68. We do not disagree with Judge Donohue's observations regarding the varied nature of parent-adult child relationships (or its opinion that, given an appropriate case, a blanket exclusion of jurors who have minor children who are patients of a physician party would be appropriate). *Id.* at 868–69 n. 8. However, while some parent-adult child relationships are weak or remote, to require a court to tease out the details of each such relationship (which may be emotionally fraught even if not "close") would invite the very shoehorning of jurors that Judge Donohue identifies as troubling. *See id.* at 863 ("[T]oo often, trial courts almost inexplicably find it necessary to shoehorn certain prospective jurors into the jury box when faced with **information that at the very least gives the appearance of an inability to be impartial.**" (emphasis added)). The issue is not whether the appearance of partiality is "for" or "against," but whether there is an appearance of partiality generally. Just as a loving adult child might be partial **to** a parent's opinions or interests, a distant or estranged one might be biased **against** those interests. There are passing few filial relationships that would not create the appearance of one or the other variety of partiality, especially when examined only briefly during *voir dire*. It is in the interest of ensuring the fact and appearance of an impartial jury not to rely on an inquiry so fine-grained that it cannot erase the stain of potential bias.

During *voir dire*, Mr. Majors attested that he did not know Dr. Ray personally, but that he "work[ed] for Heritage Valley Health System." N.T., 5/6/2011, at 107. He further testified as follows:

[COUNSEL]: Sir, do you know who owns Dr. Ray and Dr. Heinle and Dr. Farland's medical practice?

[Mr. Majors]: It's [Tri–State], which is an entity of [Heritage Valley].

[COUNSEL]: So do you understand that you and Dr. Ray technically have the same employer?

[Mr. Majors]: I do.

[COUNSEL]: ... [D]o you think that may in some way inhibit or make you in any way hesitant to find Dr. Ray negligent if the jury, if the evidence is to that effect?

[Mr. Majors]: That wouldn't influence my decision, no.

[COUNSEL]: Do you have any opinions or beliefs that if you entered a verdict in favor of the [Appellant] and awarded money damages that that may somehow adversely affect the Heritage Valley Health System's financial status?

[Mr. Majors]: Sure, it could.

*Id.* at 111–12. Thus, voir dire established that Mr. Majors believed himself to stand in the position of a de facto co-employee with Dr. Ray of Heritage Valley, which owned Tri–State. He further indicated his belief that a plaintiff's verdict would have an adverse financial impact on Heritage Valley, his employer.[10]

Once again, the trial court assessed Mr. Majors' qualification based exclusively upon Mr. Majors' testimony that his employment status would not impede his ability to deliberate impartially. The court failed meaningfully to assess the closeness of Mr. Majors' relationship with Heritage Valley and, by extension, Tri–State and Dr. Ray.

In so doing, the trial court failed to pay due regard to the consonant holdings of *McHugh, Hufnagle, Schwarzbach,* and other similar cases that, when a prospective juror is employed by a business with a financial interest in the litigation, he or she must be excluded. The weight of authority holds that even the financial interest of a non-party business entity may disqualify a juror. Thus, courts have deemed stockholders in companies with an interest in

10. Mr. Majors revealed a detailed understanding of the corporate structure of his employer, Heritage Valley. Mr. Majors testified that Dr. Ray's and her colleagues' practice, Appellee Associates of Internal Medicine was owned by Appellee "Tri–State Medical Group, which is an entity of" Heritage Valley. N.T., 5/6/2011, at 111. Mr. Majors then averred under oath that he and Dr. Ray "technically ha[d] the same employer." *Id.* The dissent nonetheless maintains that, "[a]lthough [Mr. Majors] testified that he and Dr. Ray 'technically ha[d] the same employer,' ... **this clearly was not the case.**" Diss. Op. at 861 (emphasis added). It is unclear upon what the dissent bases its conclusion that Mr. Majors' testimony so "clearly" was wrong, or, if so, that his erroneous belief that the case implicated his employer's interests is less material to the prospect or appearance of bias due to his misunderstanding.

The *voir dire* process does not allow for discovery, nor for testing venirepersons' assertions for accuracy; their sworn statements must be taken at face value when evaluating their relationships to the parties, counsel, victims, or witnesses in a given case. It is clear that Mr. Majors believed that he "technically" shared his employer with Dr. Ray. This certainly created the prospect and appearance of bias in favor of the financial interests of Heritage Valley. Moreover, regardless of who signs Mr. Majors' paychecks, it is self-evident that defendant-Appellee Tri–State's parent, Heritage Valley, had an interest in an adverse judgment against its subsidiary. Mr. Majors testified accordingly when he agreed that a verdict adverse to Tri–State might affect Heritage Valley's "financial status." N.T., 5/6/2011, at 111–12.

the outcome of a trial—without regard to whether the companies in question are parties to the litigation—to be disqualified as a matter of law. *See, e.g., Seeherman; Ozark Border; Citizens' Light & Heat, supra.*

While Mr. Majors was not employed by a named defendant in this case, he was employed by an entity that he believed loomed over himself and the other defendants. Moreover, Mr. Majors illustrated precisely the concern that required his exclusion as an employee of Heritage Valley when he acknowledged that his employer could be injured by a verdict adverse to Appellees. The prospect or appearance of bias not only was implicit as a consequence of Mr. Majors' employment by an entity with an ownership interest in the defendants, but was made explicit when Mr. Majors shared his subjective belief regarding the consequences of a plaintiff's verdict.[11]

■ Consequently, we hold that Mr. Majors' employment relationship with Heritage Valley, which had an undisputed financial interest in the outcome of the litigation recognized by Mr. Majors, created a sufficient risk of partiality to establish prejudice *per se* arising from his jury service.[12] Absent any clearly countervailing principles in our case law, Mr. Majors' employment relationship with Heritage Valley warranted disqualification, notwithstanding his asserted ability to judge the case without bias. Consequently, we find that the trial court erred in declining to dismiss Mr. Majors for cause.

## IV. Conclusion

The critical consideration that animates our ruling regarding all three jurors in this

---

11. Not only does the learned dissent err when it suggests that in *Wallace* there was a "direct" financial relationship between the juror in question and a party, attorney, victim, or witness in that case, *see supra* at 840 n. 7, it also overlooks the obvious parallel between that case and this one. In *Wallace*, the juror deemed unqualified had a financial interest as a shareholder in a corporate parent of a party defendant. *See* 497 So.2d at 452–54. Moreover, the *Wallace* court deemed the juror disqualified based upon a review of cases from numerous other jurisdictions that honored the same rule regarding non-party stakeholders with ownership interests in defendant entities. *See id.* at 453 (citing, *inter alia, Gladhill v. Gen. Motors Corp.,* 743 F.2d 1049, 1050 (4th Cir.1984); *Thompson,* 278 S.E.2d at 144; *Salina v. Commonwealth,* 217 Va. 92, 225 S.E.2d 199, 200 (1976); *Texas Power & Light,* 404 S.W.2d at 943). The dissent notes correctly that a "direct" financial interest—as of a shareholder in a party—requires exclusion, and manifestly it is a species of this consideration that requires exclusion of an employee of a party who has a personal financial interest in protecting his employer's financial interests. To the extent that it is an employee's bias in favor of an employer's financial interest that animates the time-honored employee

exclusion, it is difficult to distinguish this case sufficiently to justify a different outcome, especially when Mr. Majors testified that his employer had a financial interest in the outcome of the case.

12. Judge Donohue would hold that Mr. Majors' employer's relationship with Tri–State, without more, does not support a for-cause challenge. D.O.S.R. at 869–70. Rather, Judge Donohue would focus primarily or exclusively on Mr. Major's stated perception of his employer's financial interest in the outcome of the trial. *Id.* We do not hold otherwise. Rather, the employment relationship, viewed in tandem with Mr. Majors' comments during *voir dire,* created the appearance of a financial conflict of interest. Whether an attenuated employment relationship analogous to the relationship at issue in this case suffices to disqualify a venireperson, absent his stated belief that his employer has a financial interest in the litigation, is a question for another day. *Cf. id.* at 869 n. 10 ("If a co-employee relationship between a party and a juror is not obvious and a prospective juror is not aware of the potential economic impact of a verdict, I do not see a basis for a presumption of prejudice.").

case is the importance of ensuring not only a jury that is impartial in fact, but one that **appears** to be free of the taint of partiality to a disinterested observer, for it is disinterested observers' faith in the integrity of our judicial system that must be assured. *See Marcin,* 73 Ill.Dec. 510, 454 N.E.2d at 372 ("The trend of authority is to exclude from juries all persons who by reason of their business or social relations, past or present, with [the] parties, could be suspected of possible bias." (internal quotation marks and citation omitted)); *Stewart,* 295 A.2d at 306 (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)) ("[O]ur system of law has always endeavored to prevent **even the probability of unfairness.**" (emphasis added)); *Seeherman,* 99 A. at 176 ("It [is] certainly desirable that the cause should be tried by persons free even from the suspicion of partiality."); *Hufnagle,* 76 A. at 206 (Pa. 1910) ("[N]o person should be permitted to serve on a jury who stands in any relation to a party to the cause that would carry with it *prima facie* evident marks of suspicion of favor...." (internal quotation marks omitted)). Were a prospective juror's assurances of impartiality alone sufficient in all cases to cure the taint of a potential conflict of interest, the well-established *per se* exclusion would be stripped of its reason for being.

Precedent makes clear that even a vicarious relationship between a juror and a party, case counsel, victim, or witness may create a risk of partiality great enough to warrant disqualification without regard to the juror's assurances regarding his ability to review the case without bias. In *McHugh,* to review only one example, Mr. Fellin was not a party to the litigation, nor a witness, a victim, or an attorney; hence, the close, situational relationship with a party requiring dismissal necessarily was indirect. In *Schwarzbach,* the problematic relationship was even more remote.

We do not herein disturb the overarching principle that a party's right to an impartial jury does not entitle him to a jury of his choice. *See Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 235 (2006); *Wright v. City of Scranton,* 128 Pa.Super. 185, 194 A. 10, 12 (1937). Nor do we intend in any way to establish a new bright-line rule disqualifying all jurors with any family or business relationships in all cases to come; there are innumerable variations on the facts and circumstances of this case that cannot be anticipated.[13]

---

**13.** The dissent contends that this statement is inconsistent with our "declaration that immediate family members of individuals who treat with defendant physicians will no longer be eligible to serve as jurors." Diss. Op. at 857 n. 7. As well, the dissent asserts that, under this decision, "all employees of companies with **any** potential adverse financial exposure to the outcome of litigation will be forbidden to serve on juries in such cases." *Id.* (emphasis in original). Thus, the dissent concludes that our approach "will needlessly complicate the empanelment of juries." *Id.* at 857 n. 7.

With regard to familial relationships, this case indeed would militate strongly in favor of the exclusion of **immediate** family members of individuals who treat with a defendant physician, except perhaps in truly extraordinary circumstances not presently before us. Immediate family relationships are defined commonly, and by familiar reference sources as the sibling, spousal, and parent-child relationships. *See* Black's Law Dictionary 620 (7th ed.). This plainly is not the same as holding that "any family relationship" would require exclusion. Similarly, while this opinion will affect some jurors with indirect financial and/or employment ties to a party, that merely reflects a rule consistent with Pennsylvania precedent concerning similar ties, aligns Pennsylvania with other jurisdictions that require exclusion in such circumstances, and generally honors *stare decisis. See generally In re Burtt's Estate,* 353 Pa. 217, 44 A.2d 670, 677 (1945) ("Stare decisis simply declares that ... a conclusion reached in one

We conclude only that the close situational, familial, and financial relationships presented in the instant case necessarily stripped the trial court of its discretion to rely upon the challenged jurors' assurances of impartiality. Rather, those relationships required exclusion *per se.* Given the presence on the jury of Ms. Kaelin and Messrs. Snowden and Majors, the trial resulted in a verdict more readily questioned, and more vulnerable to the taint of partiality, than a jury comprised solely of individuals with no such relationship to case participants. Justice aspires to avoid circumstances in which lurks the specter of partiality or bias. We seek with today's holding to reinforce the importance of erring on the side of caution emphasized in *Schwarzbach, Stewart,* and other pertinent cases, and, in so doing, to protect the reputation of Pennsylvania courts for the fair and impartial administration of justice.

Consequently, we vacate the trial court's entry of judgment, reverse the trial court's order denying Appellant's post-trial motion for a new trial, deem the proceedings in this matter a mistrial, and remand.

Judgment vacated. Order denying a mistrial reversed. Case remanded for further proceedings. Jurisdiction relinquished.

OPINION IN SUPPORT OF REVERSAL by WECHT, J. joined by BENDER, J.

BOWES, J. and GANTMAN, J. concur in the result.

OPINION IN SUPPORT OF REVERSAL by DONOHUE, J. joined by GANTMAN, J. and OTT, J.

BOWES, J. concurs in the result.

DISSENTING OPINION by OLSON, J. joined by ALLEN, J.

DISSENTING OPINION BY OLSON, J.:

I respectfully dissent from the views set forth in the Opinions in Support of Reversal ("O.S.R.").[1] The law in Pennsylvania holds that indirect or mediated relationships between prospective jurors and case participants are insufficient to raise a presumption of prejudice. Therefore, in my

---

case should be applied to those which follow, **if the facts are substantially the same....**" (emphasis added)).

The dissent would institute a bright-line rule with no room for case-specific determinations, theoretically one that can be reduced to a pocket list of qualifying relationships. However, the many relationships that might appear on that list are not before us. It is a time-honored principle at the very heart of judicial review that an appellate court must not pass on issues not before it. *See Sedat, Inc. v. Fisher,* 420 Pa.Super. 469, 617 A.2d 1, 4 (1992) ("An advisory opinion is one which is unnecessary to decide the issue before the court, and ... the courts of this Commonwealth are precluded from issuing such advisory opinions."). Our extensive review of Pennsylvania's and other states' jurisprudence has made nothing so clear as the fact that determining whether to exclude a given juror, whether in an exercise of discretion or as a matter of law, is a complex inquiry. Rather

than attempt to fashion a one-size-fits-all rule to anticipate a practically infinite array of permutations of relationships like and unlike those at bar, we trust—as appellate courts often do, and as we implicitly did in *McHugh* and *Schwarzbach* (and cases cited therein)—that Pennsylvania courts carefully will apply this decision to the peculiar circumstances presented in future cases, with the benefit of adversarial presentations tailored to the circumstances then at bar.

1. While I differ from the views embraced in both Judge Wecht's Opinion in Support of Reversal (W.O.S.R.) and Judge Donohue's Opinion in Support of Reversal (D.O.S.R.), the balance of my discussion focuses exclusively upon the contentions addressed in the W.O.S.R. I note, however, that much of my rebuttal is applicable to the opinions expressed by both of my learned colleagues.

view, jurors Richard Majors, Christine Kaelin, and Sean Snowden are not subject to exclusion as a matter of law. Moreover, since the trial court's consideration of the jurors' testimony was free of palpable error, I cannot conclude that the trial court otherwise erred in failing to grant Appellant's for-cause challenge to the empanelment of those jurors. I, therefore, write separately to express my disagreement with the W.O.S.R.'s approach to the resolution of the issues raised in this appeal.

Here, none of the challenged jurors had any relationship whatsoever **with** a party, case counsel, a victim, or a witness in the instant litigation.[2] In each case, the jurors' relationship to a party arose exclusively from their relationship to a third party with no role in the litigation. Thus, no matter how one seeks to characterize the jurors' connections to this case, those connections are, at best, indirect. Consequently, under well-settled principles of Pennsylvania law, not one of the prospective jurors maintains a relationship that implicates *per se* disqualification or *de novo* appellate review.

At issue in this case is whether the prospective jurors' connections to case participants, which arose through non-parties, should subject those jurors to compulsory or discretionary exclusion. This issue turns on the language of our governing legal standard, particularly that portion which addresses situations that compel a trial judge to presume prejudice and excuse a juror for cause as a matter of law. I believe that the text of the rule guides both our selection of the standard of review as well as the scope of compulsory exclusion from jury service. Under the standard, when a prospective juror's connection to a case participant stems from a relationship with a non-party, qualification for jury service becomes a matter for the trial court's discretion and should be reviewed accordingly.

The W.O.S.R. excludes the challenged jurors as a matter of law, not on grounds that that the trial court abused its discretion.[3] Ms. Kaelin and Mr. Snowden are precluded from serving as jurors because members of their families treat with Dr. Ray. Mr. Majors is excluded because of his employment with a company whose corporate affiliate owns Dr. Ray's medical practice.

I cannot agree with the W.O.S.R.'s election to review the trial court's decision to empanel the challenged jurors as a question of law. Our standard, articulated by this Court over 40 years ago, states:

**2.** None of the challenged jurors knew Dr. Ray before trial commenced or were employed by the defendant entities. Hence the record is undisputed that the jurors are connected to the litigation only through an individual or entity common both to the juror and one of the defendants to this action.

**3.** The W.O.S.R. does not claim to fault the trial court's consideration of the testimony offered by the challenged jurors as to their ability to examine the facts fairly and impartially. In fact, the W.O.S.R. admits, if resolution of this appeal turned on the answers and demeanor of the jurors during *voir dire* as observed by the trial judge, then the court's ruling is clearly sustainable because it is free of palpable error. *See* W.O.S.R. at 835 ("Were the fitness of the jurors in question dependent solely upon their indications under oath regarding their ability to be impartial, our deference to the trial court's findings with regard to these answers would compel affirmance."). Instead, the W.O.S.R. asserts that the trial court erred in failing to discern that the situational relationships existing among the challenged jurors, the parties, and non-parties were sufficiently close to compel exclusion as a matter of law. *See id.* ("[D]espite the trial court's focus on the jurors' own testimony, the challenge presented here turns instead upon the situational relationships of the challenged jurors to the parties and interested non-parties.")

An analysis of case law indicates that there are two types of situations in which challenges for cause should be granted: (1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at [v]oir dire. In the former situation, the determination is practically one of law and as such is subject to ordinary review. In the latter situation, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in case of palpable error.

*Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326, 327–328 (1972).

As our standard makes clear, a trial court may grant a challenge for cause as a matter of law under the first category in *Colon* only when a prospective juror maintains such a close relationship **with a party, case counsel, a victim, or a witness** that the court will **presume** a likelihood of prejudice. *Id.* Because the trial court's decision in such circumstances is practically one of law, its determination is subject to more enhanced appellate review. *See id.* The learned W.O.S.R. does not dispute this proposition. Instead, the W.O.S.R. quotes the following passage

from *Commonwealth v. Johnson*, 299 Pa.Super. 172, 445 A.2d 509 (1982):

> The two situations [identified in *Colon* ] . . . are not mutually exclusive, and it is to be expected that some cases will present both situations. Thus a prospective juror may indicate by his answers on voir dire that he will not be impartial—the first situation—and the reason for his attitude may be that he has a particular relationship with someone involved in the case—the second situation.

W.O.S.R. at 834, *citing Johnson,* 445 A.2d at 512. The W.O.S.R. then states that it will apply *de novo* review in this case, the more enhanced form of appellate scrutiny, because the first category of *Colon* involves a question of law.[4] While I agree that the first category of *Colon* involves a question of law, I find nothing in *Johnson* that brings this appeal within the narrow class of cases subject to compulsory exclusion and to which enhanced appellate review applies. Indeed, a careful review of *Johnson* confirms it does not support a finding of compulsory exclusion and the application of *de novo* review in this case.

In *Johnson,* the defendant was convicted of criminal conspiracy, robbery, possession of an instrument of crime, and simple assault. At trial, the court rejected defense counsel's request to excuse a prospective juror for cause. The basis for counsel's request was that the juror's daughter had been the victim of a rape and robbery that possessed several important similarities

4. In citing to the statement in *Johnson* that the two categories in *Colon* are "not mutually exclusive," the W.O.S.R. appears to suggest that an appellate court may apply *de novo* review whenever the trial court's discretionary rulings are unassailable. I do not read *Johnson* as sanctioning such an open-ended approach to appellate adjudication. As I shall explain in greater detail below, in *Johnson,* we did not examine a single ruling by the trial court under the *de novo* review standard. In fact, after considering the nature of the juror's connection to the participants in that case, we rejected compulsory exclusion and *de novo* review. Instead, we confined our analysis and holding strictly to the issue of whether the trial court abused its discretion. Thus, notwithstanding its declaration that the two categories listed in *Colon* are not mutually exclusive, *Johnson* supports discretionary review in cases where a prospective juror's relationship to a case participant arises indirectly through a connection with a non-party.

with the facts in *Johnson.* The similarities greatly distressed the juror and his suffering became evident during *voir dire.* This led to the following extensive side-bar colloquy between the trial court and the juror, which was quoted at length in this Court's opinion:

THE COURT: [Juror], you related to me that—about an incident that occurred to your daughter and during that incident you were emotionally upset, and I was aware of your emotion and that concerns me, so I'm going to ask you that supposing in this case—supposing in this case there would be some evidence like similar to—supposing one of the witnesses would say that this man—this is a hypothetical question, that this man wouldn't do something to her, sexually, if he didn't give the money or something of that sort; would that so overwhelm and emote [sic] you that you would be overwhelmed as to your conscience so that you couldn't be fair to both sides?

[JUROR]: Not only in answer to what you said but in thinking over my observation of my own reaction when I related this to you, I didn't realize how strongly I feel about this and if I consider that, I'm not what I thought I was and trying to be fair and consider the evidence in such a case and—

THE COURT: You believe you would be fair?

[JUROR]: I think it would be difficult because I can see how I'm reacting. I didn't realize how strongly I felt about this.

THE COURT: The charges here are not involving sex at all.

[JUROR]: I think just the fact that what happened to her in such an unusual condition, I think also was a robbery but at the last moment this is what the robbers did.

THE COURT: Okay. Now, the fact that that happened in that case, which is certainly unrelated to the evidence in this case, I mean what happened in one instance in another case—on another case under different circumstances doesn't mean it happened in this case. You are to consider only the evidence in this case.

[JUROR]: That's what I realize and that's what I thought sitting there before and realizing, thinking about it and realizing how I reacted just relating the incident signifies to me a much stronger—

THE COURT: Will you react to somebody else being molested? Will you react to that?

[JUROR]: I think it would bring back to mind the things I imagined happened at the time with my daughter.

THE COURT: Even though I instruct you that that's not a proper way to deal with it?

[JUROR]: I realize that, logically. It should not be so but I could see emotionally, I can see that I don't have full control in that case, because as I said, I didn't realize how strong it was in relating it to you and I didn't expect myself to break down, practically.

THE COURT: When it involves your daughter, I can see it, and you're relating a story involving your daughter but when it involves another person and you're asked to be a Juror because that's what we do and—

[JUROR]: I realize that. I'm wondering if I am able to do it.

THE COURT: You have to determine that whether the evidence is true in the other case, when you looked at your daughter, you said, well, my, why would my daughter go through this and what happened to your daughter, you can vis-

ualize as having happened but here you have to first determine whether it's true and then if you determine that, then you apply the law.

[JUROR]: I see.

THE COURT: So, you see it isn't every time that somebody says something that it's true. You have to determine that at first. Can you do that without being so upset as to impair your ability of making fair judgments?

[JUROR]: All right. I'll do that.

THE COURT: You must commit yourself to that endeavor, and if you have any reservations, we want to hear about it. We can't have to [sic] so emotionally blank because something happens to you that you can't think, so you can apply yourself in a fair way. I mean, you know yourself best. We all have some emotional feelings about our members of our family. The question is whether that emotional feeling which is unrelated to this matter can overwhelm your faculties so that you could no longer be fair and be objective about a situation that's unrelated. That's the question. Can you be fair?

[JUROR]: Yes.

THE COURT: In an unrelated matter?

[JUROR]: Yes.

THE COURT: I'm going to repeat that again and going to say that supposing the evidence in this case should, for some reason, be that one of the victims may say and he threatened to do something to me sexually if I didn't give him the money, for some reason, would that so emote you as to overwhelm your faculties that you could no longer be fair?

[JUROR]: No. I think I could.

THE COURT: Be fair?

[JUROR]: Be fair.

THE COURT: All right. You may take your seat.

*Johnson,* 445 A.2d at 512–513.

In *Johnson,* this Court acknowledged that a prospective juror's close relationship to a victim of a separate crime did not compel a finding of prejudice in every case; thus, we declined to adopt a rule requiring compulsory exclusion of family members of crime victims. *Id.* at 514. However, based upon the review of the juror's testimony on *voir dire,* the Court found the particular facts in *Johnson* to be "especially compelling." *Id.* This Court therefore observed:

**[The juror] vividly demonstrated during voir dire that he would be likely not to be an impartial juror. He not only visibly manifested emotional distress but specifically expressed substantial doubts about his ability to be impartial at least five times.** Although he acknowledged that "logically" he could separate the robbery and rape of his daughter from the robbery of appellant's victims, he added at once that "emotionally, I can see that I don't have full control."

*Id.* (emphasis added). On the strength of these observations, this Court said that the juror's eventual assurance that he could be fair did not dispel the force of his prior candid admissions. *Id.* The Court also expressed skepticism about the juror's assurances given that they appeared to be the product of suggestive questioning by the court aimed at eliciting a judicially desired response. *Id.* For each of these reasons, this Court determined that "the [trial] court's refusal to excuse [the juror] for cause [constituted] **an abuse of discretion.**" *Id.* (emphasis added).

The record in the present appeal stands in stark contrast to the facts before this Court in *Johnson.* Each of the challenged jurors in the instant case professed his or

her ability to deliver a verdict based upon a fair and impartial consideration of the evidence introduced at trial. Moreover, each of the jurors confirmed that his or her relationship with non-parties would not impair his or her ability to perform his or her duties in an unbiased manner. The trial court found their sworn testimony during *voir dire* to be worthy of belief and the W.O.S.R. concedes an "undisputed absence of admissions of partiality" (W.O.S.R. at 835) and finds no fault in the trial court's assessment of the juror's statements in *voir dire*. *See* W.O.S.R. at 835 ("Were the fitness of the jurors in question dependent solely upon their indications under oath regarding their ability to be impartial, our deference to the trial court's findings with regard to these answers would compel affirmance."). Unlike the juror in *Johnson,* the challenged jurors here gave unwavering assurances of impartiality. In view of these significant factual distinctions, I do not find that *Johnson* offers compelling guidance for finding error in the present case.

I also cannot agree that *Johnson,* in stating that the two categories identified in *Colon* are not mutually exclusive, allows an appellate court to consider questions of law when the relevant juror/case participant relationships are indirect and the discretionary determinations of the trial court are free of error. *Johnson's* rationale does not support such a proposition. This Court acknowledged, in *Johnson,* that the juror's daughter was the victim of a prior robbery and rape. In terms of the claims and arguments raised in the present appeal, the juror in *Johnson* had a close familial relationship with a non-party (his daughter) that, in turn, gave rise to an indirect situational connection with a case participant (a sympathetic predisposition toward the victim of the crimes then under review). Despite our awareness of these facts, this Court **refused** to apply *de novo*

review and find *per se* prejudice. Instead, we restricted our analysis to the trial court's conduct and assessment of the juror's testimony during *voir dire,* which fell exclusively within the scope of the trial court's discretionary authority. The conclusion in *Johnson, i.e.* that a new trial was warranted because the trial court abused its discretion, confirms the limited scope of our inquiry. Unlike the W.O.S.R. in the present case, this Court in *Johnson* did not attempt to transfer the intimacy and depth of the juror's relationship with his daughter to the indirect situational connection between the juror and the victim and then, in turn, review the case as one that involved the legal question of whether a sufficiently close relationship compelled exclusion. Thus, while *Johnson* states that the case categories identified in *Colon* may not be mutually exclusive, *Johnson* confirms that discretionary review is appropriate where a juror maintains only an indirect connection to a case participant.

Moreover, as made clear in *Colon* and *Johnson,* neither enhanced appellate review nor compulsory exclusion is triggered in this instance merely because there is the prospect or appearance of partiality or bias of the three jurors. Although the W.O.S.R. views the potential loyalties of the jurors as its central concern in this case (*see* W.O.S.R. at 835), the mere potential for bias or impartiality does not justify *per se* exclusion or *de novo* appellate review because such a formulation would inevitably cast a wider net for compulsory exclusion than that which is permitted under the governing standard. In every case in which even a tangential connection exists, a prospective juror's potential for bias could conceivably be called into question. Yet, our standard does not envision compulsory exclusion and heightened appellate scrutiny in every such instance. Given the obvious difference between a mere "poten-

tial for bias" and the far higher threshold of a "presumption of the likelihood of prejudice," I cannot agree with the W.O.S.R.'s effort to equate these vastly divergent formulations.

The W.O.S.R.'s holding in this case illustrates this tension. On one hand, the W.O.S.R. finds that the challenged jurors' situational and financial relationships with non-parties compel their exclusion as a matter of law. Indeed, as the W.O.S.R. concedes, its ruling will "militate strongly in favor of the exclusion of immediate family members of individuals who treat with a defendant physician." *Id.* at 846 n. 13 (continuation) (emphasis omitted). On the other hand, the W.O.S.R. expresses reluctance to follow suit in similar cases. *See Id.* at 843 ("We do not posit that no one may be qualified to sit in judgment of a physician simply for knowing or being related in some way to a patient thereof."), 846 ("Nor do we intend **in any way** to establish a new bright-line rule disqualifying all jurors with any family or business relationships in all cases to come[.]") (emphasis added), and 847 ("We conclude **only** that the close situational, familial, and financial relationships presented **in the instant case** necessarily stripped the trial court of its discretion to rely upon the challenged jurors' assurances of impartiality.") (emphasis added). I believe that this creates uncertainty as to the scope and extent of the W.O.S.R.'s holding. If the challenged jurors are legally ineligible, then all similarly situated jurors must be excluded in future cases, as the W.O.S.R. purports to do with "immediate family members" of those who treat with a defendant physician. If, however, the W.O.S.R.

has decided this case on its own unique facts and the holding is not meant to establish new bright-line rules for future cases, then the W.O.S.R. has essentially undertaken a review of the trial court's discretionary determinations but issued its conclusion as a pronouncement of law. I would avoid this confusion and hold that, in the absence of a disqualifying **direct** relationship with a case participant, a juror's exclusion from service should remain within the discretionary authority of the trial court and we should review the court's determination for an abuse of that discretion.

Our decision in the leading authority confirms my approach. In *Colon,* the Commonwealth charged the defendants with various offenses arising from the robbery of a bar, including shooting at police officers with the intent to kill. During *voir dire,* the trial judge refused to dismiss a local police commissioner from the jury for cause. The jury acquitted the defendants of allegedly shooting at the police but convicted them of the other crimes.

On appeal, we considered "whether law enforcement officials, because of their occupational relationship to criminal cases, should automatically be removed for cause, or whether they should be removed only if their likelihood of prejudice is manifested by their answers and demeanor on [v]oir dire." *Colon,* 299 A.2d at 328. We held that law enforcement officers were not subject to compulsory exclusion from criminal cases generally, noting that "[a]bsent any real relationship to the case, the removal of an enforcement officer should depend on the sound exercise of discretion by the trial judge."[5] *Id.* In reaching this

---

5. The record in *Colon* showed that the police commissioner gave uncertain answers during *voir dire* concerning his ability to impartially evaluate police testimony and that his responses raised doubts about his potential bias.

*Id. Colon,* 299 A.2d at 328 (Spaulding, J., dissenting). Hence, we ultimately held that because some of the crimes charged involved risks to police officers similar to those faced by the police commissioner, there was a likeli-

conclusion as to the exclusion of classes of jurors as a matter of law, we reasoned that "[t]he categories of relationships which automatically call for removal should be limited because it is desirable to have a jury composed of persons with a variety of backgrounds and experiences." *Id.* (emphasis added).

*Colon* articulated a preference for a narrowly circumscribed set of relationships that qualified for compulsory exclusion and elevated appellate scrutiny. Hence, after reviewing cases, this Court in *Colon* determined that compulsory exclusion would extend only to cases in which "the potential juror had such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses." *Id.* at 327 (emphasis added). The plain text of the rule that emerged from *Colon* demands that a disqualifying relationship be a direct and immediate connection that exists between the prospective juror and a party, case counsel, a victim, or a witness.[6] Conspicuously absent from *Colon's* definition of the relationships that compel *per se*

---

hood of prejudice which should have led the trial court to exercise its discretion in excusing the commissioner for cause. *Id.* at 328–329.

**6.** My reference to a "direct and immediate connection" between a prospective juror and a case participant as the exclusive triggering factor for *per se* disqualification and enhanced appellate review arises from the language and application of our well-settled standard. Hence, the phrase "direct relationship" enjoys over four decades of support in Pennsylvania case law. As even the W.O.S.R. recognizes, our controlling standard provides that a presumption of prejudice arises "when the potential juror has such a close relationship, be it familial, financial, or situational, with parties, counsel, victims, or witnesses." *See* W.O.S.R. at 834 (emphasis added), *quoting Colon, supra.* The W.O.S.R. cites this binding precedent but then ignores it by sweeping juror relationships with non-parties into the narrow class of cases that require compulsory exclusion and call for enhanced appellate scrutiny. While I agree that many of our prior cases have spoken in terms of "real" or "close" relationships, I would point out that all of our cases have required record evidence of a tangible connection between a prospective juror and a case participant before *per se* prejudice is found. *See Colon*, 299 A.2d at 328 (police officer's occupational relationship with non-party law enforcement organization insufficient to constitute real or close relationship with case participant that compelled exclusion from jury as a matter of law). Thus, whether the standard is framed in terms of a "close," "real," or "direct" relationship, Pennsylvania law holds that juror connections that arise solely through non-parties do not meet the criteria for compulsory exclusion or *de novo* review. *See Commonwealth v. Blasioli*, 454 Pa.Super. 207, 685 A.2d 151, 159 (1996) (juror's physician-patient relationship with wife of prosecutor constituted attenuated, not direct, connection and thus did not support finding of *per se* prejudice), *aff'd*, 552 Pa. 149, 713 A.2d 1117 (1998). The W.O.S.R. cites to *Schwarzbach v. Dunn*, 252 Pa.Super. 454, 381 A.2d 1295 (1977) for support; however, like *McHugh* and *Johnson*, *Schwarzbach* is distinguishable from the case before us. In *Schwarzbach*, the record was devoid of any facts from which the court could determine what the relationship was between the juror's wife and plaintiff's attorney and whether the juror was properly or improperly empaneled. As this Court made clear, if the facts had been established, it was possible that there would have been no harm in having the juror hear the case. As this Court noted, "the relationship of the juror in this case may have caused [defense] counsel to exercise a peremptory challenge as to the juror if he had been appraised as to the relationship. [Defense] counsel, however, learned of the relationship only after the verdict had been rendered ... thus, there was no reason for the defense to question the prospective jurors on *voir dire* about this inherently prejudicial situation." *Id.* at 1298 (internal quotation omitted). In this case, there was extensive *voir dire* and the evidence is undisputed that the challenged jurors did not know Dr. Ray and that they lacked any personal connection with the case participants. Hence, Appellant has not demonstrated any relationship—whether real, close, or direct—that disqualified the challenged jurors as a matter of law.

disqualification are relations between prospective jurors and **non-parties** who, in turn, maintain some connection to a case participant. The W.O.S.R.'s approach, which finds a presumption of prejudice because of a juror's relationship with a non-party, represents a sharp departure from prior precedent because it ushers in an entirely new category of cases in which compulsory exclusion must be found and to which enhanced appellate review must be applied. Until now, such indirect relationships did not meet the criteria for compulsory disqualification or heightened review and instead fell within the scope of the trial court's discretionary determinations. *See McHugh v. P & G Paper Prods. Co.,* 776 A.2d 266, 270 (Pa.Super.2001) (Superior Court will presume prejudice to ensure fairness "[w]hen presented with a situation in which a juror has a close relationship **with participants in the litigation** [*]) (emphasis added); *see also Commonwealth v. Blasioli,* 454 Pa.Super. 207, 685 A.2d 151, 159 (1996) (juror's physician-patient relationship with wife of prosecutor constituted attenuated, not direct, connection and thus did not support finding of *per se* prejudice), *aff'd,* 552 Pa. 149, 713 A.2d 1117 (1998).

Without even a hint of reservation, these more recent decisions have consistently followed *Colon's* refusal to apply compulsory disqualification to cases in which a prospective juror's connection to litigation emerges solely through a relationship with a non-party. In these cases, we were careful to distinguish between challenges for cause alleging indirect or mediated relationships (*i.e.* cases in which a prospective juror's connection to a case participant arose through a non-party), and challenges for cause claiming direct connections between potential jurors and litigants, case counsel, victims, or witnesses. As to the former, we flatly rejected *per se* disqualification, applied a more deferential standard of review, and demanded proof of palpable error on the part of the trial court before awarding relief.

In *Blasioli,* the prospective juror testified during *voir dire* that she worked at the same hospital as the prosecutor's wife, who also served as her family doctor. *Id.* at 158. The juror also stated that she had seen the prosecutor on a few occasions in social settings at the hospital, such as fundraisers, but they had not interacted. *Id.* After the juror agreed to do her best to be impartial and set aside her doctor-patient relationship with the prosecutor's wife, the trial court rejected defense counsel's motion to strike for cause. *Id.* at 159. We affirmed the trial court's ruling, concluding that, in view of the juror's statements during *voir dire,* the trial court's decision was free of palpable error. *See id.* We deferred to the trial court's observations of the juror's conduct and demeanor during *voir dire* because we found that the juror's "patient-physician relationship with the wife of the prosecutor did not rise to the level where the trial court could have presumed the likelihood of prejudice." *Id.* We were cautious in *Blasioli* to contrast the indirect and mediated relationship *sub judice* with the direct and substantial connection under review in *Commonwealth v. Perry,* 441 Pa.Super. 409, 657 A.2d 989 (1995). *See Blasioli,* 685 A.2d at 159 n. 15. In *Perry,* this Court held that the trial court should have excused a potential juror for cause as a matter of law when that juror testified that he was best friends with the arresting officer and that he had no doubts regarding the officer's veracity. *Perry,* 657 A.2d at 991. We observed in *Perry* that these facts demonstrated a direct relationship between the juror and a witness which, in turn, created a likelihood of prejudice that could not be ignored despite the juror's testimony that

he could be impartial and assess the officer's credibility fairly. *Id.*

The grounds for my departure from the W.O.S.R.'s approach do not end with prior decisions issued by this Court. Our Supreme Court has never endorsed the W.O.S.R.'s expansive view, which compels exclusion for cause based solely upon a prospective juror's relationship with a nonparty even where there is **no** relationship between the juror and any participant in the litigation. To the contrary, in cases that involve indirect and mediated relationships between jurors and case participants, our Supreme Court has consistently endorsed a deferential approach to appellate review of the trial court's findings and rulings. For example, in *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999), a juror advised the trial court that she had an attenuated familial relationship with the appellant's co-defendant. In response to questioning by the trial court, the juror stated that the relationship would not affect her ability to be fair and impartial in her consideration of the evidence. Thereafter, the trial court rejected defense counsel's request to remove the juror for cause. On appeal, our Supreme Court held that the trial court did not abuse its discretion in refusing to strike the juror. The Court quoted with approval the trial court's opinion in which it found that the juror's relationship was attenuated, that she dutifully disclosed the connection after becoming aware of it, and that she testified credibly as to her ability to act impartially. *Koehler*, 737 A.2d at 238. In affirming the order rejecting counsel's request to exclude the juror, the Supreme Court reasoned that the trial court was in a superior position to assess the credibility of the juror and to refuse to excuse the juror when it believed she qualified as a fair and impartial arbiter of the facts. *Id.; see also Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 332–334 (2011) (applying

palpable abuse of discretion standard to order denying appellant's request to excuse for cause three jurors who possessed only attenuated relationships to homicide victims and their families); *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 299–300 (1996) (refusal to remove venireperson whose brother was a police officer in same district where capital murder occurred was not an abuse of discretion, where venireperson indicated no difficulty in being fair, stated that he assumed defendant was innocent and that he could be a fair juror, and affirmed that he would not tell his brother he was serving on jury); *Linsenmeyer v. Straits*, 402 Pa. 7, 166 A.2d 18 (1960) (according wide latitude to trial court's discretion in ruling on challenges for cause and concluding that prospective jurors who knew plaintiff's counsel and had legal relationship with firm representing plaintiff were not disqualified from service on those grounds).

The W.O.S.R.'s response to this line of authority is to suggest that the challenged relationships in the cases cited above were more attenuated than the relationships currently under review. *See* W.O.S.R. at 838 n. 5 (continuation). This is unconvincing. As a preliminary matter, the W.O.S.R.'s response fails to bring this appeal within the traditional line of authority in which *per se* disqualification has been found based on a direct relationship between a prospective juror and a case participant. Moreover, the W.O.S.R.'s response simply begs the question: How in future cases will a trial judge be able to discriminate between cases that involve a juror/nonparty relationship that is so indirect or mediated that exclusion should remain a matter within the court's discretion and cases that involve such a "sufficiently close" relationship that exclusion is compelled as a matter of law? While it is clear to the W.O.S.R. that the relationships at

issue in this case are "sufficiently close" so as to invalidate jury participation as a matter of law, today's decision lacks any consistent and objective criteria by which trial judges can distinguish cases of the first type from cases falling within the latter category. *See id.* at 843 ("We do not posit that no one may be qualified to sit in judgment of a physician simply for knowing or being related in some way to a patient thereof.") and 846 ("Nor do we intend in any way to establish a new bright-line rule disqualifying all jurors with any family or business relationships in all cases to come; there are innumerable variations on the facts and circumstances of this case that cannot be anticipated.").[7] We are left, then, with a judicial pronouncement, issued as a proclamation of law, where even the W.O.S.R. admits to uncertainty as to the parameters and application of its ruling in cases to come. Such an *ad hoc* approach to appellate review will inevitably hinder, not aid, trial courts tasked with the duty to apply our decision in the jury selection process.

Thus, the cases dealing with for-cause challenges to jury service reveal that Pennsylvania law is quite clear and consistent. A motion to strike a juror for cause should be granted where: 1) questioning by the trial court or counsel demonstrates a **direct**[8] familial, financial, or situational relationship between a juror and the parties, counsel, victims, or witnesses such that the court must presume a likelihood of prejudice; or 2) a likelihood of prejudice arises from the juror's conduct or his answers to questions posed by the court and/or counsel. In the first situation, where the facts demonstrate a close relationship between a juror and a case participant, we consider the trial court's determination to be "practically one of law" which is subject to ordinary review,[9] a more enhanced level of appellate scrutiny than that which is applied to the second category identified above.[10] In the latter

---

7. While the W.O.S.R. purports to eschew establishment of new bright-line rules, this is clearly inconsistent with its declaration that immediate family members of individuals who treat with defendant physicians will, except in extraordinary instances, no longer be eligible to serve as jurors. W.O.S.R. at 846 n. 13. Moreover, given that we deal here with decisions that are made "practically as a matter of law," I believe that the precedential impact of the W.O.S.R.'s holding will extend much further. Under the W.O.S.R.'s view, all employees of companies with **any** potential adverse financial exposure to the outcome of litigation will be forbidden to serve on juries in such cases. *See* W.O.S.R. at 844 (stating that employment "by a business with a financial interest in [litigation compels exclusion]" and that "even the financial interest of a non-party business entity may disqualify a juror"). I envision that the W.O.S.R.'s approach will needlessly complicate the empanelment of juries in many of our less populated counties where connections, whether indirect or direct, between litigants and prospective jurors are a common occurrence.

8. As explained *supra* at footnote six, the term "direct" is employed to make clear that compulsory exclusion is required only where the potential juror has a close relationship **with a case participant.** It is my view that the presence of an intermediary to complete the jurors' connection to a case participant renders the juror's relationship indirect and, therefore, defeats the call for *per se* exclusion and heightened appellate scrutiny. Jurors connected to a case participant through an intermediary may be excluded for cause, but only at the discretion of the trial court.

9. Ordinary review by an appellate court calls for determining whether the trial court abused its discretion or erred as a matter of law. *McHugh*, 776 A.2d at 270.

10. It is important to bear in mind that the type of appellate review we apply reflects the nature of the trial court's determination. We apply a more exacting standard of review in the first category of cases because these matters involve a decision which deals with readily ascertainable relationships between the juror and case participants and is practically

circumstance, where a direct relationship as described in the first category does not exist and the likelihood of prejudice derives from the juror's conduct and answers to questions, a presumption of prejudice may not be inferred as a matter of law. Instead, the trial court exercises its discretion to determine, based on the prospective juror's conduct, demeanor, and answers to questions during *voir dire*, whether the juror would be able to set aside any perceived bias and decide the case fairly and impartially. The court's ruling is subject to reversal only in the case of palpable error, a more deferential form of review, as much depends upon the trial court's impression of the answers and demeanor of the prospective juror and the trial court occupies a far better position to make the relevant assessments than an appellate court. *See McHugh*, 776 A.2d at 270. Pennsylvania courts have adopted this approach in recognition that "[t]he mere fact that jurors may show some indicia of pretrial prejudice is not enough to require that they be stricken from the jury. We do not expect jurors to be free from all prejudices ... rather, the law requires them to be able to put aside their preju-

dices and determine guilt or innocence on the facts presented." *Blasioli*, 685 A.2d at 159 (case citation and internal quotation omitted).

I also part ways with the W.O.S.R. because I believe that its application of *de novo* review and its finding of *per se* prejudice under the particular facts of this case are misplaced. Two simple syllogisms lie at the core of the W.O.S.R.'s rationale with respect to the jurors in this case. One involves Ms. Kaelin and Mr. Snowden and the second involves Mr. Majors. The first points out that doctors share a close relationship with the patients that they treat. W.O.S.R. at 842–43. Next, the W.O.S.R. observes that parents and children and husbands and wives share intimate bonds. *Id.* at 842–43 Lastly, based upon these relationships, the W.O.S.R. infers that doctors must share a close and intimate bond with the **non**-treating spouses and children of their patients. *Id.* at 843. The second logical chain proceeds in similar fashion. First, the W.O.S.R. notes that employees possess a bond of loyalty with their employers. Next, the W.O.S.R. states that a company maintains a financial interest

---

one of law. *Cf. Blasioli*, 685 A.2d at 159 (juror's physician-patient relationship with wife of prosecutor constituted attenuated, not direct, connection; thus, relationship did not support finding of *per se* prejudice and discretionary review was appropriate); *Perry*, 657 A.2d at 991 (juror who was best friends with arresting officer and who had no doubt as to officer's veracity had sufficiently close relationship with case participant to compel exclusion from jury as a matter of law); *Colon*, 299 A.2d at 328 ("[t]he categories of relationships which automatically call for removal should be limited"). In such cases, the trial court enjoys very little leeway since we, as an appellate court, can review a cold record and determine, with reasonable confidence, whether the trial court correctly assessed an alleged disqualifying relationship in making its empanelment determination. By contrast, when a potential juror's connection to a case

is more indirect and the second category comes into play, our review grows more deferential as much depends on the trial court's impression of *voir dire* testimony, which the trial court is better suited to evaluate. *See McHugh*, 776 A.2d at 270.

It is undisputed here that there is no disqualifying direct relationship as between any of the challenged jurors and the participants in this litigation. Instead, the relationships are mediated. It requires an expansive discussion by the W.O.S.R. to explain why *per se* exclusion could even conceivably extend beyond traditional limits and include relationships between jurors and non-parties. Rather than alter the discrete contours of the first category, I would hold, pursuant to settled Pennsylvania case law, that the second category applies here and our review should be for an abuse of discretion.

with its corporate affiliates. Finally, on the strength of those connections, the W.O.S.R. infers that an employee of a nonparty has a close financial relationship with the corporate affiliate of his employer. *Id.* at 844–45.

I agree that: 1) Dr. Ray maintains close relationships with the patients that she treats; 2) Ms. Kaelin shares an intimate bond with her parents; 3) Mr. Snowden shares an intimate bond with his wife; 4) Mr. Majors possesses a bond of loyalty with his employer, Heritage Valley; and, 5) Heritage Valley has a financial interest in its corporate affiliate, Tri–State. What I do not share is the W.O.S.R.'s willingness to transfer the strength, intimacy, and depth of these direct relationships to the mediated and indirect connections between the challenged jurors and case participants, particularly where the facts of record unambiguously establish that **no** direct relationships exist between the jurors and the parties and that **no** bias arose from any indirect bond.

The W.O.S.R. holds that "the clinical relationships of Ms. Kaelin's and Mr. Snowden's close family members with Dr. Ray were sufficiently close and real to warrant a finding of *per se* prejudice." W.O.S.R. at 842. This holding speaks only to the relationships between the jurors' family members and Dr. Ray; it says nothing about any connection between Dr. Ray and the jurors. The clinical relationships that the W.O.S.R. deems central to this case simply do not exist between the jurors and Dr. Ray.

The testimony offered by Ms. Kaelin and Mr. Snowden confirms that no relationship existed between the jurors and Dr. Ray. Although Ms. Kaelin testified that her parents treated with Dr. Ray and went to see her frequently, she did not know how long they treated with the doctor. N.T., 5/6/11, at 180. Ms. Kaelin recalled that she went to Dr. Ray's office with her mother on a single occasion but she sat in the waiting room. *Id.* Ms. Kaelin never met Dr. Ray and she did not view her parents' favorable impression as a reason to believe Dr. Ray's testimony over that of another witness, adding that she would reject Dr. Ray's testimony if the doctor was discredited. *Id.* at 180–181. Significantly, Ms. Kaelin confirmed that she could find Dr. Ray negligent if the evidence supported such a determination. *Id.* at 181. Mr. Snowden's testimony was even less supportive of a finding of *per se* prejudice. He was unaware that his wife even treated with Dr. Ray until he discovered this fact by chance after trial commenced. N.T., 5/11/11, at 2 and 5. He, too, did not know Dr. Ray personally and said that his wife's status as Dr. Ray's patient would not affect his ability to render a fair verdict in this case. *Id.* at 5. Given the absence of personal acquaintance, the near non-occurrence of any visits by the jurors to Dr. Ray's office, the fact that the jurors' family members were not witnesses and had no role in this case, and counsel's failure to demonstrate a fixed pretrial opinion or bias in the minds of the jurors, I believe that there is no basis to find *per se* prejudice or a "close" or "real" relationship between the jurors and Dr. Ray.[11]

11. I see no basis for the W.O.S.R.'s conclusion that the jurors' family members "implicitly" endorsed Dr. Ray's competency. W.O.S.R. at 843. More importantly, the record is devoid of testimony showing that the jurors adopted any such "implied" endorsements as their own. I also discern no basis for finding *per se* prejudice in the "explicit" endorsement of Dr. Ray made by Ms. Kaelin's parents. Ms. Kaelin testified that her parents liked Dr. Ray as a doctor. N.T., 5/6/11, at 180. It is unclear whether this comment referred to Dr. Ray's competence as a medical professional or some other facet of her practice. Counsel had every opportunity during *voir dire* to clarify the nature of this comment

*See, e.g., Commonwealth v. Rough,* 275 Pa.Super. 50, 418 A.2d 605, 609–610 (1980) (juror's prior discussion of defendant's crimes with neighbor did not establish sufficiently "close" or "real" relationship that compelled exclusion as a matter of law where neighbor was not called as a witness or otherwise related to the case and juror had not formed fixed opinion about matters raised at trial).

The only Pennsylvania case to consider the issue of whether a juror should be disqualified based upon a family member's physician-patient relationship with a defendant doctor is the Commonwealth Court's decision in *Estate of Hannis v. Ashland State Gen. Hosp.,* 123 Pa.Cmwlth. 390, 554 A.2d 574 (1989), *appeal denied,* 524 Pa. 632, 574 A.2d 73 (1989). In *Hannis,* the appellant argued that it was error for the trial court to deny a challenge for cause where the child of a prospective juror received ongoing treatment from the defendant physician in a medical malpractice action. *See id.* at 578. In affirming the trial court's refusal to remove the juror, the Commonwealth Court held that there was no abuse of discretion where the juror credibly testified that she had no reservations about deciding issues relating to the doctor. *Id.* at 578. Insofar as whether such circumstances warrant compulsory or discretionary exclusion, I find *Hannis* to be persuasive and supportive of my view that removal of the three jurors in this case should remain subject to the discretionary authority of the trial court.

The W.O.S.R. sees the issue differently. The W.O.S.R. declines to follow *Hannis* because the Commonwealth Court "failed even to acknowledge the *per se* prejudice that [this Court has] recognized arises in the context of certain close relationships, and made no assessment as to whether the relationship there at issue caused such prejudice as a matter of law." W.O.S.R. at 842. Given the fact that there is no Pennsylvania authority for the proposition that exclusion must be ordered as a matter of law because of a juror's relationship with a non-party, I do not believe that the Commonwealth Court failed to spot the issue. In my view, the Commonwealth Court's decision to address the issues in *Hannis* as claims arising within the discretionary authority of the trial court enjoyed over four decades of support under Pennsylvania law.[12] Hence, I would follow that decision here.

I also disagree that Mr. Majors' employment with Heritage Valley Health System ("Heritage Valley"), a company with no role in the litigation, supports the W.O.S.R.'s finding of *per se* prejudice or the existence of a "close" or "real" financial relationship with a party. The record shows that Mr. Majors worked for Heritage Valley, overseeing the leases for which Heritage Valley served as landlord, preparing annual budgets for two of its hospitals, managing financial statistical data, and preparing reports. He did not participate in, or provide, medical treatment services. Heritage Valley was not a defendant in this action but was the parent

---

but he failed to do so. Even if we were to assume that this affirmative endorsement referred to Dr. Ray's competence, the record does not establish that Ms. Kaelin agreed with it or accepted it as her own. I cannot conclude that Ms. Kaelin's mere awareness of her parents' endorsement of Dr. Ray demonstrates *per se* prejudice in the absence of proof that she shared their opinion.

12. This is not to say that a juror whose family member treats with a defendant doctor must be empaneled; however, if such a juror is to be disqualified, it should be ordered through an exercise of the trial court's discretion.

company of Tri–State Medical Group ("Tri–State"), a defendant in this action that owned Dr. Ray's medical practice group.

Mr. Majors' testimony during *voir dire* refuted any claim of bias or *per se* prejudice and offered no basis upon which to conclude that he had a close relationship with any of the defendants or a financial interest in the outcome of the litigation. Mr. Majors was not employed by a party to this action and did not know Dr. Ray personally. Although he testified the he and Dr. Ray "technically ha[d] the same employer," N.T., 5/6/11, at 111, this clearly was not the case. Mr. Majors was employed by Heritage Valley. Dr. Ray was employed by Tri–State. Heritage Valley and Tri–State are separate entities. Mr. Majors testified without hesitation that his employment with Heritage Valley and Dr. Ray's employment with Tri–State would not cause him to hesitate in finding Dr. Ray negligent if the evidence supported such a determination. *Id.* at 112. Mr. Majors also affirmed under oath that while a verdict in favor of Appellant might affect Heritage Valley's financial status, it would not deter him from considering the evidence in a fair and impartial manner or awarding damages against Dr. Ray if she

was negligent in rendering medical services. *Id.* at 108–112. Counsel for Appellant **did not ask** Mr. Majors if he believed that a verdict in favor of Appellant would have an adverse impact on his employment with Heritage Valley or his personal financial security. Based upon this testimony, the trial court correctly determined that Mr. Majors was able to render a fair and impartial verdict and properly denied Appellant's motion to challenge Mr. Majors for cause.

The W.O.S.R. relies on *McHugh, supra* to assert that a sufficiently close financial relationship existed between Mr. Majors and Heritage Valley, a non-party, and by extension, Dr. Ray and Tri–State, to compel Mr. Majors' exclusion from the jury.[13] *McHugh* is easily distinguishable from the present case and, therefore, does not support the W.O.S.R.'s contention.

*McHugh* involved a personal injury action brought by McHugh against Proctor & Gamble Products Company ("Proctor & Gamble"). At trial, one of Proctor & Gamble's employees, Patrick Fellin, served as the company's representative, sitting at counsel table throughout the trial. During interviews of the venirepersons, counsel asked prospective jurors whether any of them knew Fellin. Five prospective jurors

---

**13.** The W.O.S.R. also relies, in part, on cases in which stockholders in corporate parties or insurance companies bound to indemnify a defendant have been disqualified from jury participation. *See* W.O.S.R. at 839–40 (citing cases). These analogies are inapposite. In those cases, the jurors maintained direct financial relationships with parties to the respective actions which would invalidate their eligibility for jury service as a matter of law under the traditional parameters of Pennsylvania jurisprudence. *See Seeherman v. Wilkes–Barre Co.*, 255 Pa. 11, 99 A. 174 (1916) (owner of bond issued by defendant company disqualified from jury service); *Salt River Valley Water Users' Ass'n v. Berry*, 31 Ariz. 39, 250 P. 356 (1926) (upholding challenge for cause against stockholders of private corpora-

tion in action against the company); *McLaughlin v. Louisville Electric Light Co.*, 100 Ky. 173, 37 S.W. 851 (1896) (concluding, without discussion, that stockholder in corporation that owned stock in defendant company had a disqualifying interest); *Ozark Border Electric Cooperative v. Stacy*, 348 S.W.2d 586 (Mo.Ct.App.1961) (noting general rule that stockholder in corporation is incompetent to serve as juror in action where company is a party or has a direct pecuniary interest); *Citizens' Light, Heat & Power Co. v. Lee*, 182 Ala. 561, 62 So. 199 (1913) (stockholder in insurer bound to indemnify defendant subject to disqualification for cause); *Wallace v. Alabama Power Co.*, 497 So.2d 450 (Ala.1986) (shareholder in parent company of corporate defendant subject to disqualification for cause).

responded in the affirmative. Of these, three currently worked at the subject Proctor & Gamble facility, one had retired from the location, and one was Fellin's father-in-law. *See McHugh*, 776 A.2d at 268. At that point, counsel for McHugh asked the trial court to remove all potential jurors employed by Proctor & Gamble and to strike Fellin's father-in-law for cause. The trial court denied McHugh's motion. In reversing the trial court's order as to the four Proctor & Gamble employees, we concluded that a motion to strike for cause must be granted if a juror is employed by a party-litigant. *Id.* at 271. Moreover, as to Fellin's father-in-law, we said that his close familial relationship to the personal representative of the defendant precluded his participation on the jury.[14] *Id.* at 272. None of these factors is present in this case. Hence, *McHugh* does not support reversal of the trial court's ruling allowing Mr. Majors to serve on the jury.

The W.O.S.R. concedes that *McHugh* does not support the removal of Mr. Majors for cause based solely upon his employment relationship with Heritage Valley. *See* W.O.S.R. at 839 ("Our analysis in *McHugh* ... [is] not entirely dispositive of our determination as to whether the trial court should have [excluded] the jurors at issue ... in the instant case.") and 845 ("Mr. Majors was not employed by a named defendant in this case[.]"). Notwithstanding these concessions, the W.O.S.R. asserts that Mr. Majors' employment "by an entity that he believed loomed over himself and the other defendants," coupled with his acknowledgement that his employer could be harmed by a verdict in favor of Appellant, was sufficient to create a risk of *per se* prejudice that disqualified him for jury service as a matter of law.[15] *See id.* at 844–45. *McHugh*, however, did not speak to employment with a non-party; it held only that a motion to strike for

---

14. The W.O.S.R. cites *McHugh* as an example in which this Court excluded a juror based upon mediated financial relationships to parties. Referring to Fellin, who it claims was not a party, a witness, a victim, or an attorney, the W.O.S.R. argues that "[p]recedent makes clear that even a vicarious relationship ... may create a risk of partiality great enough to warrant disqualification without regard to the juror's assurances [of impartiality]." W.O.S.R. at 846. This contention misreads *McHugh*. As a preliminary matter, Fellin's father-in-law was excluded from the jury because of his close familial relationship to Fellin, who sat at counsel's table as Proctor & Gamble's designated corporate representative. Fellin, in his capacity as a designated representative of the corporation at trial, clearly qualified as a case participant because of his status as a party's authorized agent. *Utica Mutual Ins. Co. v. Contrisciane*, 504 Pa. 328, 473 A.2d 1005, 1013 (1984) (a corporation can only act through its directors, officers and agents). *McHugh* does not extend *de novo* review or compulsory exclusion to cases in which a prospective juror's relationship to

a case participant arises only through a connection with a non-party.

15. In reaching its decision regarding Mr. Majors, the W.O.S.R. relies heavily upon his *voir dire* testimony that he "technically" shared an employer with Dr. Ray but rejects his statement that this would not influence his decision. *See* W.O.S.R. at 843–45, *citing* N.T., 5/6/11, at 107, 111–112. In other words, in concluding that Mr. Majors was subject to compulsory exclusion, the W.O.S.R. credits certain aspects of Mr. Majors' testimony and rejects other statements which the trial court found worthy of belief. The W.O.S.R.'s reweighing of the trial court's discretionary determinations is contrary to settled principles of appellate scrutiny.

I also believe that, similar to the cases of Ms. Kaelin and Mr. Snowden, the W.O.S.R.'s conclusions here relate only to Mr. Majors' relationship with his employer, Heritage Valley, which was not a party to the litigation. The W.O.S.R. makes no tangible connection between Mr. Majors and any defendant. *McHugh* does not compel exclusion or sanction *de novo* review under these circumstances.

cause must be granted if a juror is employed by a party-litigant.[16] *See McHugh,* 776 A.2d at 271. Thus, *McHugh* supports neither the W.O.S.R.'s conclusion that Mr. Majors should be disqualified from jury service as a matter of law nor its suggestion that we should subject the trial court's ruling to more enhanced appellate scrutiny.

I must stress that my position in this case does not foreclose all avenues of relief for parties who seek to challenge jurors who have mediated relationships with case participants and who, therefore, are not subject to *per se* disqualification. Such parties remain free to seek relief pursuant to the trial court's discretionary authority. During *voir dire,* trial counsel may ask questions of prospective jurors and explore relevant relationships in an effort to develop a record in support of a motion to strike for cause. In presenting the motion, counsel may emphasize the concerns raised by the W.O.S.R. such as the appearance of impartiality, the absence of any factors that would impede the empaneling of a qualified jury, and the potential effects that an attenuated relationship might have upon the fairness of a prospective juror. If the court denies the motion, then the challenging party is free to take an appeal raising the court's abuse of discretion in light of a well-developed record.

In this case, I would hold that the trial court correctly determined that the facts of this case did not give rise to a sufficiently close relationship between Appellees and the challenged jurors such that a presumption of prejudice arose as a matter of law. Moreover, I discern no basis upon

which to conclude that the trial court committed palpable error in considering the demeanor and responses of the prospective jurors during the course of *voir dire.* Accordingly, I would affirm the judgment entered by the trial court.

## OPINION IN SUPPORT OF REVERSAL BY DONOHUE, J.:

I join in Judge Wecht's Opinion in Support of Reversal's (W.O.S.R.) holding that Juror Snowden should have been presumed prejudiced and replaced with an alternate juror based upon the physician-patient relationship between Juror Snowden's wife and the defendant Dr. Ray. Further, while I agree with Judge Wecht that the trial court erred by failing to discharge, for cause, Juror Kaelin and Juror Majors, I respectfully disagree in part with the rationale advanced by Judge Wecht in support of his decision. I write separately to set forth my reasoning and points of divergence.

### *Legal Standard*

I begin by voicing my emphatic agreement with Judge Wecht that "[t]he critical consideration that animates our ruling regarding all three jurors in this case is the importance of ensuring not only a jury that is impartial in fact, but one that **appears** to be free of the taint of partiality to a disinterested observer[.]" W.O.S.R. at 845–46 (emphasis in the original). Contrary to this overarching consideration, too often trial courts almost inexplicably find it necessary to shoehorn certain prospective jurors into the jury box when faced with information that at the very least gives the appearance of an inability to be impartial.[1]

---

**16.** Heritage Valley's status as a pervasive regional employer aside, Heritage Valley was not a party in this case and, therefore, I believe that any comparison to Proctor & Gamble's status in *McHugh* is not proper. Hence, given the limited scope of our holding

in *McHugh,* I cannot agree with the W.O.S.R.'s citation to that case as support for its criticism of the trial court's refusal to excuse Mr. Majors from the jury.

**1.** I recognize that there are financial considerations associated with bringing citizens to

In my view, we must be guided by the jury selection principle articulated by our Supreme Court that "no person should be permitted to serve on a jury who stands in any relation to a party to the cause that would carry with it prima facie evident marks of **suspicion of favor**." *Seeherman v. Wilkes–Barre Co.*, 255 Pa. 11, 14, 99 A. 174 (1916) (emphasis added) (internal quotation marks omitted). As succinctly stated by the *Seeherman* Court: "[T]he cause should be tried by persons free even from the suspicion of partiality." *Id.* at 14–15, 99 A. at 176.[2]

### Standard of Review

I agree with Judge Wecht that the appropriate standard of review in this case is not driven by the direct/indirect relationship analysis suggested by the learned Dissent. *See* Diss. Op. at 847–59.

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of

prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions.

*McHugh v. Proctor & Gamble Paper Products Co.*, 776 A.2d 266, 270 (Pa.Super.2001) (citation omitted). Therefore, there are two circumstances that warrant removal of a juror from the venire for cause: (1) the juror has a close familial, financial, or situational relationship with a case participant such that a presumption of prejudice exists ("the first category"), or (2) the juror exhibits a likelihood of prejudice through his or her conduct and answers to questions during *voir dire* ("the second category"). *See Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326, 327 (1972) (*en banc*). "Our standard of review of a denial of a challenge for cause differs, depending upon which of these two situations is presented." *McHugh*, 776 A.2d at 270. Critically for this discussion, as in every case that comes before us, the standard of review we employ is determined by how the appellant frames and argues the issue. *See, e.g., Lanning v. West*, 803 A.2d 753, 766 (Pa.Super.2002) (although listed as a weight of the evidence claim, argument was a challenge to the sufficiency of the evidence, which required a different standard of review); *Commonwealth v. Howard*, 373 Pa.Super. 246, 540 A.2d 960, 961 (1988) ("[a] **contention** that the sentence imposed constitutes cruel and

---

the courthouse to participate in the jury selection process. In my view, however, such considerations do not trump the guarantee provided by both the United States and Pennsylvania constitutions of a trial "by an impartial jury[.]" U.S. CONST. amend. 6; PA. CONST. art. I § 9; *see also* PA. CONST. art. I § 6 ("Trial by jury shall be as heretofore, and the right thereof remain inviolate."). Thus, I do not believe that presumptively partial and unfair jurors should be seated if there was no other way to empanel a jury. A trial is either fair or it is not and litigants are entitled to a jury free from bias and prejudice.

2. This long-standing principle conforms to the closely related standard for judicial recusal. The inquiry for a judge is not whether he or she is actually biased or prejudiced, but whether "a significant minority of the lay community could reasonably question the court's impartiality," based on the **appearance of impropriety**. *Commonwealth v. Darush*, 501 Pa. 15, 24, 459 A.2d 727, 732 (1983); *In the Interest of McFall*, 533 Pa. 24, 31, 617 A.2d 707, 711 (1992).

unusual punishment is a challenge to the legality of sentence which may be appealed as of right on direct appeal") (emphasis added).

Here, Appellant unquestionably raises and argues trial court error based upon its failure to **presume prejudice** because of the relationships the jurors had with a case participant pursuant to the first category of challenges for cause. Therefore, "[our] determination is practically one of law, and as such, is subject to ordinary review," which the *McHugh* Court defined as "whether the trial court abused its discretion or erred as a matter of law." *McHugh*, 776 A.2d at 270, 270 n. 3. Both Judge Wecht and the Dissent agree that our standard of review under the first category is *de novo*. *See* W.O.S.R. at 834; Diss. Op. at 848–49. This is akin to "ordinary review" as defined in *McHugh*, as both are premised on determining whether the trial court committed an error of law. *See McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa.Super.2013) ("To the extent that the trial court's findings are predicated on errors of law, we review the court's findings de novo."); *see also In re Doe*, 613 Pa. 339, 355–56, 33 A.3d 615, 625–26 (2011) (a court abuses its discretion, in relevant part, by misapplying or overriding the law).

By not recognizing the requirement that this Court conduct a *de novo* review, in my assessment, the learned Dissent conflates our **standard of review** with what the Dissent believes is the appropriate **outcome of our review** which, according to the Dissent, is that the trial court did not err as a matter of law or abuse its discretion by failing to find a presumption of prejudice that warranted the exclusion of the jurors at issue. The Dissent repeatedly asserts that because none of the jurors in question had a direct relationship with a case participant, it is improper for this Court to apply a *de novo* standard of review pursuant to the first category of challenges for cause. However, the evidence presented regarding the relationship between the juror and a case participant determines whether the trial court should have presumed prejudice because of the relationship. The parameters of the juror's alleged disqualifying relationship do not determine the standard of review we employ to decide whether prejudice should have been presumed. If the Dissent is correct in the determination of our standard of review, we would never have new case law recognizing additional relationships that warrant a presumption of prejudice and, of course, our jurisprudence is to the contrary.[3]

---

**3.** Pennsylvania courts have recognized categories of relationships that require a juror's exclusion from a jury based solely on the nature of the relationship. *See, e.g., Silvis v. Ely*, 3 Watts & Serg. 420, 424 (Pa.1842) (a stockholder of a corporation cannot sit as a juror in a case in which the corporation has an interest); *McHugh*, 776 A.2d at 271 (finding an employer/employee relationship between a party and a prospective juror to require the juror's automatic exclusion from the venire). We have likewise recognized fact-specific (non-categorical) relationships that required the presumption of prejudice and a strike for cause. *See, e.g., Commonwealth v. Jones*, 477 Pa. 164, 169, 383 A.2d 874, 877 (1978) (plurality) (deciding that police officer

should have been automatically excluded from the jury based on the facts of the case, not pursuant to a *per se* rule); *Schwarzbach v. Dunn*, 252 Pa.Super. 454, 381 A.2d 1295, 1298 (1977) (*en banc*) (juror excluded for cause where juror's wife was employed by plaintiff's counsel and indeterminate circumstances of employment required presumption of prejudice); *Commonwealth v. Johnson*, 299 Pa.Super. 172, 445 A.2d 509, 512–14 (1982) (the fact that the juror's daughter had previously been the victim of a crime would not necessarily have mandated exclusion, but under the facts as presented, a presumption of prejudice was warranted).

Judge Wecht refers to all of the cases where prejudice is presumed as *"per se"* prejudice

As a result, I agree with Judge Wecht's conclusion that a potential juror's familial, financial or situational relationship with a party, victim, witness, or attorney involved in the case need not be direct in order to warrant his or her disqualification as a matter of law. *See* W.O.S.R. at 837–40. A potential juror may testify to a relationship with a party or case participant that, on its face, does not appear to be sufficiently close to warrant a presumption of prejudice, but when the juror reveals more information, a presumption of prejudice arises. As the situational relationship is flushed out, striking the juror for cause is required regardless of whether the juror believes the relationship would affect his or her ability to be fair and irrespective of whether there is a direct relationship between the potential juror and the party, participant or the case. *See, e.g., Schwarzbach v. Dunn*, 252 Pa.Super. 454, 381 A.2d 1295, 1298 (1977) (*en banc*) and n. 3, *supra*. Indeed, when a presumption of prejudice applies, there is no place for a juror's assertion of fairness because an inability to be fair is presumed.

### Analysis

When presented with the situational and financial relationship-based challenges for cause to the prospective jurors at issue in this appeal, the distinguished trial court substituted acceptance of each of the challenged juror's statement that he or she could be fair and impartial for an analysis of the need for a presumption of prejudice. N.T., 5/6/11, at 118 ("I have to assume that [a juror] will be fair when he answers 'fair,' " and stating that defense counsel risked his ability to make a challenge for cause because he "took [Juror Majors] too far" by asking him whether he could be fair and impartial); *id.* at 186–87 ("The cases say that if a prospective juror answers that, 'Yes, I can put aside any prejudices that I have prior to the case and decide the case only on what I see and hear in the courtroom,' those cases say that [the trial court is] not to strike them for cause"); N.T., 5/11/11 (in chambers) at 6 (trial court stating that because Juror Snowden said "he can be fair and impartial," it would not substitute an alternate); *id.* at 7–8 (same).

As stated above, however, a juror's assurance that he or she can be fair and impartial is not relevant when considering whether prejudice should be presumed based on the juror's relationship with someone involved in the case. Although the trial court's opinion reflects a consideration of the factual testimony of each of the jurors, the record does not reflect such an analysis during *voir dire*. There is no indication that the trial court considered the substance of the jurors' statements during *voir dire* to decide whether a disqualifying situational, familial, or financial relationship existed. Instead, the trial court incorrectly assumed that any disclosed conflict could be cured with the juror's affirmation that he or she could be fair and impartial. This was clear error. Given our *de novo* standard of review, I agree with Judge Wecht that for each of the challenged jurors, a relationship existed—directly or indirectly—between each juror and a party to the case such that the appearance of partiality that arose as a result of those relationships required dis-

situations. *See* W.O.S.R. at 835, 837–38. Black's Law Dictionary defines *"per se"* as "[o]f, in, or by itself; standing alone, without reference to additional facts. As a matter of law." BLACK'S LAW DICTIONARY, per se (9th ed. 2009). While all of the above referenced cases were decided "as matter of law," in my view, only *Silvis* and *McHugh* are aptly described as case law recognizing a *per se* presumption of prejudice since the other referenced cases required facts outside of the relationship itself to establish the presumption of prejudice.

qualification. *See Seeherman*, 255 Pa. at 14–15, 99 A. at 176. My departure from Judge Wecht's decision is in the breadth of the holding as to each of the jurors.

## Juror Snowden

Juror Snowden learned after trial began that his wife was not only a patient of the defendant, Dr. Ray, but that she was going to obtain a prescription from Dr. Ray for Chantix, a smoking cessation drug, which was the subject of testimony in the case. N.T., 5/11/11 (in chambers), at 2–4, 7. I agree with Judge Wecht that Juror Snowden's wife's relationship with Dr. Ray warrants the recognition of a *per se* categorical rule that calls for the removal of a juror from the venire and I specifically join in that holding. And while Judge Wecht may be correct that "it cannot be gainsaid that the spousal relationship . . . is among the closest of human connections,"[4] I embrace the conclusion because the law has long recognized the confidential bond between spouses[5] and the sharing of confidences attendant to the relationship. The recognition of the closeness of the relationship and the loyalty of spouses to each other should logically be extended here to recognize the impact of the relationship on a juror's ability to be impartial.[6] To presume that a juror has a prejudice based on a relationship that his or her spouse has with a party or other case participant is warranted under long standing legislative and jurisprudential principles recognizing the special bond between husband and wife and I agree with the adoption of that categorical presumption of prejudice here. As in *Schwarzbach*, the risk is too great that this juror's wife could influence him in deciding a case where her physician is the defendant. *See Schwarzbach*, 381 A.2d at 1298. Juror Snowden should have been replaced with one of the alternate jurors. This type of development is precisely the reason alternate jurors are chosen and the failure here to seat an alternate was error.[7] *See* W.O.S.R. at 843.

4. Judge Wecht holds:

> Ms. Kaelin's and Mr. Snowden's close familial relationships with patients of Dr. Ray warrant a finding of *per se* prejudice. We do not posit that no one may be qualified to sit in judgment of a physician simply for knowing or being related in some way to a patient thereof. But the bonds between parent and child, and husband and wife, are too strong, and the attendant interests too inextricably intertwined, to allow us to draw the distinction between direct and vicarious clinical relationships that we would require in order to affirm the trial court's decision. It cannot be gainsaid that the spousal and filial relationships are among the closest of human connections. Accordingly, the trial court erred when it declined to disqualify Ms. Kaelin and Mr. Snowden as jurors.

W.O.S.R. at 843 (footnote omitted).

5. *See, e.g.*, 42 Pa.C.S.A. § 5913 ("Except as otherwise provided in this subchapter, in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse [ . . . ]."); 42 Pa.C.S.A. § 5914 ("Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial."); *Commonwealth v. Lewis*, 39 A.3d 341, 351 (Pa.Super.2012), *appeal denied*, 616 Pa. 667, 51 A.3d 838 (2012) (trial court erred by compelling husband to testify against wife in a criminal trial when husband invoked spousal privilege).

6. In my assessment, this is a commonsense expansion of our holding in *Schwarzbach*, where the decision to exclude the juror in question was based upon the Court's conclusion that it was "quite possible" that a wife could influence her husband in deciding the matter before the court based upon her prior employment relationship with counsel for one of the parties. *Schwarzbach*, 381 A.2d at 1298.

7. The failure to replace Juror Snowden with an alternate is, from my determinations, theo-

### Juror Kaelin

Juror Kaelin, testified, in relevant part, that Dr. Ray is her parents' physician. Her parents have told her that they "see Dr. Ray a lot," and that "[t]hey like her." N.T., 5/6/11, at 180. Juror Kaelin further testified that she transported her mother to see Dr. Ray on one occasion but remained in the waiting room during the visit. Despite her knowledge of her parents' relationship with Dr. Ray, Juror Kaelin testified that she thought she could be a fair and impartial juror.

While I agree with Judge Wecht that Juror Kaelin should have been disqualified, I disagree with Judge Wecht that the simple fact that the juror's parents were patients of the defendant doctor in this medical malpractice case required her exclusion from the jury. *See* W.O.S.R. at 842–43; *supra* n. 4. I cannot embrace Judge Wecht's definition of this category of persons presumed to be prejudiced because, from my perspective, not all parents and adult children enjoy the closeness of relationship, loyalties and sharing of confidences assumed by Judge Wecht. Moreover, I am not aware of anything in our jurisprudence recognizing a broad acceptance of Judge Wecht's view of the relationship between an adult child and a parent.[8]

From my observation and perspective, not all adult children have an on-going interest in their parents' medical treatment, speak to their parents about their medical treatment or providers, or know their parents' perceptions of their physicians. In this case however, Juror Kaelin's involvement in her parents' medical affairs and knowledge about her parents' positive perception of the defendant gives the appearance of favor and partiality, warranting a presumption of prejudice. Juror Kaelin's testimony revealed a prejudicial taint based on an intimacy with her parents that included knowledge of their medical treatment and their positive per-

---

retically one shoehorning a juror into service on the jury. Not only was the juror's wife treating with the defendant doctor, the juror, after being presented with the defendant's disclosure that his wife was a patient, admitted having a conversation with his wife after the commencement of trial concerning the defendant and a prescription for a drug at issue in the case. The decision to allow this juror's continued service on this case seems to turn a blind eye to an obvious appearance of partiality.

8. Judge Wecht confines his holding to the relationship between an adult child and his or her parent and not a parent to his or her adult or minor child. *See* W.O.S.R. at 843, 846 n. 13. While I cannot accept Judge Wecht's adoption of the adult child-parent relationship as a basis for a presumptively prejudicial situation, like the spousal relationship discussed *supra*, there are other familial relationships recognized in the law that, in my view, deserve a finding of a presumption of prejudice. Thus, for example, despite the contrary conclusion of our sister court in *Es-* *tate of Hannis v. Ashland State Gen. Hosp.*, 123 Pa.Cmwlth. 390, 554 A.2d 574 (1989), *appeal denied*, 524 Pa. 632, 574 A.2d 73 (1989), I believe that a presumption of prejudice would be warranted where the minor child of a juror is a patient of a defendant or witness in a medical malpractice action. A child's treating physician is generally chosen by, and serves at the pleasure of, a minor child's parent. Opinions of the parent formed as a result of the child's treatment are at least as strongly held as those held as a result of the parent's own treatment. Such a presumption is in keeping with the Pennsylvania Legislature's recognition that parents generally have control over their minor children's medical care. *See, e.g.,* 11 P.S. § 2513(a) (stating, in relevant part, that a parent whose parental rights to his or her child has not been terminated has the power to consent to the child's medical and mental health treatment); *see also* 35 P.S. § 10101 ("Any minor who is eighteen years of age or older, or has graduated from high school, or has married, or has been pregnant, may give effective consent to medical, dental and health services for

ception of Dr. Ray. The purpose of *voir dire* is not served where, as here, a juror is empaneled who comes to the case imbued with her parents' preconceived impression of a party who is their active treating physician.

I have little doubt that if Juror Kaelin had testified, for example, that her parents were dissatisfied with Dr. Ray's treatment and that they only continued to treat with her because of insurance policy limitations, the trial court would have granted the defendant's challenge for cause based upon her preconceived negative impression of the defendant. Excusing Juror Kaelin for cause under those hypothetical circumstances would have been required. Here, it was equally an error of law for the trial court to deny Appellant's challenge for cause under the circumstances presented.

**Juror Majors**

The final juror at issue is Juror Majors, who testified that his employer is Heritage Valley Health Systems, which is the parent company of Tri–State Medical Group, a named defendant that owns Dr. Ray's medical practice. When asked, Juror Majors testified that he believed the outcome of the case could have a financial impact on his employer. N.T., 5/6/11, at 112. It does not matter if his assessment was accurate. It is also irrelevant that he later

stated that he could nonetheless "be just," and that his belief that the outcome of the case could financially impact his employer would not affect his decision as a juror in the case. *See id.* On its own, his belief that his employer would be impacted by the verdict establishes an impermissible financial link between Juror Majors and this case. I agree with Judge Wecht that this requires a presumption of prejudice and Juror Majors' exclusion from the jury for cause. *See* W.O.S.R. at 844–45.

I do not believe that Juror Majors' employer's ownership interest in Tri–State supports a challenge for cause and, to the extent that Judge Wecht holds that it does, I disagree. *See id.* at 845 ("The prospect or appearance of bias not only was implicit as a consequence of Mr. Majors' employment by an entity with an ownership interest in the defendants, but was made explicit when Mr. Majors shared his subjective belief regarding the consequences of a plaintiff's verdict."). The purported employment relationship between Juror Majors and Dr. Ray,[9] standing alone, is too attenuated to warrant the grant of a challenge for cause in this case.[10] Rather, as Judge Wecht recognizes, the presumption of prejudice here derives from Juror Majors' perception of the financial impact the verdict could have

himself or herself, and the consent of no other person shall be necessary.").

9. Juror Majors testified, in relevant part, as follows:

> [Juror Majors]: [ ... ] I work for Heritage Valley Health System, and I manage the leases where Heritage Valley is landlord. [ ... ] I know Dr[s]. Ray, Heinle and Farland have a company that they lease their office back to the, their office back to Tri–State Medical Group.
>
>      *     *     *
>
> [Counsel]: Sir, do you know who owns Dr. Ray and Dr. Heinle and Dr. Farland's medical practice?

> [Juror Majors]: It's Tri–State Medical Group, which is an entity of Heritage Valley Health System.
>
> [Counsel]: So do you understand that you and Dr. Ray technically have the same employer?
>
> [Juror Majors]: I do.
>
> N.T., 5/6/11, at 107–08, 111.

10. Here, Juror Majors purportedly understood the intricacies of the interrelated corporate structure of this integrated health care system. If a co-employee relationship between a party and a juror is not obvious and a prospective juror is not aware of the potential economic impact of a verdict, I do not see a basis for a presumption of prejudice.

on his employer. I believe that disqualification based on this perception is consistent with and required by *McHugh*, which is premised on the notion that a person cannot render an impartial verdict where his or her livelihood will be impacted by it. *See McHugh*, 776 A.2d at 272.

For the foregoing reasons, I concur in the result reached by Judge Wecht and agree that Appellant is entitled to a new trial.